## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

PARK IRMAT DRUG CORP. )
 )
    Plaintiff, ) **COMPLAINT**
 )
 - vs. - )
 ) Index No. _____
EXPRESS SCRIPTS HOLDING COMPANY )
and EXPRESS SCRIPTS, INC. )
 )
    Defendants. )

  Plaintiff Park Irmat Drug Corp. d/b/a Irmat Pharmacy ("Irmat"), through its undersigned

attorneys, alleges -- upon knowledge with respect to its own acts and those it witnessed first-

hand, and upon information and belief with respect to all other matters -- for its Complaint

against Defendants Express Scripts, Inc. ("ESI") and Express Scripts Holding Company

(together referred to as "Express Scripts") as follows:

### NATURE OF THE ACTION

  1. This case concerns an illegal scheme conceived, initiated, conducted, and

maintained by Express Scripts – the largest Pharmacy Benefit Manager ("PBM") in the country –

and its PBM co-conspirators to suppress competition from independent pharmacies in markets

for mail-order pharmacy services.  Express Scripts and its co-conspirator PBMs, including CVS

Health Corporation ("CVS Health"), administer the pharmacy benefits for most of the largest

health plans in the United States, covering the costs of medications prescribed to approximately

150 million Americans.  While administrating pharmacy benefits for third parties, Express

Scripts and its co-conspirators also own and operate mail-order pharmacies that compete with the

mail-order pharmacy services offered by plaintiff Irmat and which would be offered by scores of

pharmacies but for the PBM conspirators' conduct.

2.      The PBM conspirators' ownership of pharmacies has infected them with conflicts of interest that distort their decision making.  Rather than engage in actions that are in the best interests of their members, assuring the best quality and lowest cost pharmacy services to them, the PBM conspirators have taken actions to protect their bottom-line profits by engaging in a campaign to destroy the vibrant competition that independent mail-order pharmacies, like Irmat, offer and would offer to patients.  As a result of these conflicts of interest, Express Scripts and its co-conspirators agreed to exclude numerous independent pharmacies from the PBMs' respective pharmacy networks.  This exclusion has, in turn, effectively prevented tens of millions of patients from choosing to fill their prescriptions at preferred independent pharmacies that offer high quality and low cost service, such as Irmat.

3.      All of the co-conspirator PBMs belong to the Pharmaceutical Care Management Association ("PCMA"), a trade association whose ostensible purpose is to advocate for its PBM members.  Through the PCMA, Express Scripts and its co-conspirators hatched and furthered their plans to foreclose competition from mail-order pharmacies that dared to compete with those owned by the PBMs.  In furtherance of this scheme, each of the PBM co-conspirators took actions to, among other things, (1) engage in abusive audits of competitor pharmacies, (2) terminate mail-order pharmacies, and/or (3) reimburse pharmacies for dispensing prescription drugs far below their costs of acquiring them, thereby forcing these pharmacies to limit their services or otherwise exit the pharmacy business altogether.

4.      As part of this scheme, Express Scripts terminated Irmat, a New York-based pharmacy providing mail-order services nationwide, from the Express Scripts pharmacy network on or about September 30, 2016.  Express Scripts did so after demanding that Irmat "cease and desist" mailing prescriptions to Express Scripts' members.  Express Scripts' pretext, at the time

2

of Irmat's termination, was that its network rules and contract with Irmat did not allow Irmat --
or any pharmacy in the Express Scripts network other than Express Scripts' own, proprietary
pharmacy -- to mail prescriptions to Express Scripts' members.  That position is wholly rebutted
by Express Scripts' prior written communications to Irmat.

5.     Express Scripts, indeed, terminated Irmat for its competitive mail order activities
*after it had expressly permitted Irmat to mail prescriptions to Express Scripts members.*  In July
2015, Irmat notified Express Scripts, in a re-credentialing application that Express Scripts
required its network pharmacies to submit, that 65% of Irmat's prescription volume was
delivered by mail.  Ex. 1.  One month later, Express Scripts wrote to Irmat that, based upon a
***"review"*** of Irmat's ***"submitted credentials,"*** Express Scripts had ***"approved"*** Irmat ***"to
continue in the Express Scripts Holding Company pharmacy networks."***  Ex. 2 (emphasis
added).  Relying on this approval, Irmat made large, multi-million dollar investments in its mail
order distribution business.

6.     About nine months later, Express Scripts unilaterally reversed its contractual
pledge to permit Irmat to dispense drugs via mail order through a "cease and desist" letter (sent
on or about May 18, 2016).  For the year prior to this time, sales to Express Scripts members
made up tens of millions of dollars of Irmat's revenue.

7.     After receiving this cease and desist notice, Irmat engaged Express Scripts in
hopes of resolving any concerns that Express Scripts had over Irmat's business, particularly as
Express Scripts accounted for so much of its business and Irmat had expended millions of dollars
in costs in reliance on Express Scripts' prior written "approval" of Irmat's mail-order activities.
Irmat's engagement fell upon deaf ears.  By letter dated July 15, 2016, Express Scripts notified
Irmat that Express Scripts had decided to terminate Irmat from Express Scripts' network

effective September 14, 2016 because Irmat purportedly violated rules prohibiting it from mailing prescriptions and because, Express Scripts falsely claimed, Irmat failed to use its "best efforts" to dispense formulary drugs.

8.      Irmat appealed its termination through Express Scripts' internal appeal process (which is a transparent attempt by Express Scripts to cloak its settled termination decisions in the veneer of due process).  By letter dated August 22, 2016, Express Scripts informed Irmat that Express Scripts had decided to affirm its termination decision and, for the first time, notified Irmat that Express Scripts was terminating Irmat "without cause," purportedly under the parties' network agreement.  Express Scripts was not authorized by the parties' contractual arrangement to unilaterally terminate Irmat without cause, following its explicit approval of Irmat's mail-order activities in August 2015, as seen by the fact that Express Scripts did not even raise the specter of a "without cause" termination of Irmat until months after the sending of its original cease-and-desist and termination letters.

9.      Express Scripts' termination of Irmat deprives millions of patients nationwide of the services of a mail-order pharmacy accredited by the most prestigious third-party standards organizations in the pharmacy business.  It also deprives these patients of a mail order pharmacy that offers specific dermatological expertise and exceptional customer service.

10.     Express Scripts' termination of Irmat has crippled Irmat's business.  Prior to termination, a substantial volume of Irmat's sales were to Express Scripts' members.  The loss of these sales is devastating to Irmat.

11.     Express Scripts' termination of Irmat is the most damaging hit in an onslaught of attacks from Express Scripts' co-conspirator PBMs that Irmat has sustained over the past year-and-a-half.  But it is not the most recent.  Repeatedly Irmat has had to succumb to abusive,

costly, and meritless audits engaged in, as well as repeated termination threats made by, Express Scripts' co-conspirator PBMs.  Recently, per the conspiracy, CVS Health terminated Irmat, effective February 3, 2017.  CVS Health's termination of Irmat occurred after conducting several abusive audits of Irmat – audits that evidence that Irmat's claims for payment have always been valid.

12.     Given that the PBMs have virtually unchecked power to exclude independent pharmacies from the PBMs' pharmacy networks, the conspiracy alleged herein has successfully suppressed competition from independent pharmacies, such as Irmat, and will continue to do so.

13.     Express Scripts' conduct amounts to violations of the Sherman Act, a breach of contract -- including a breach of the implied covenant of good faith and fair dealing inherent in all contracts --  and a violation of certain states' Any Willing Provider laws.  Irmat seeks damages to remedy the catastrophic financial harm it has sustained as a result of Express Scripts' conduct, in addition to injunctive relief that would prevent Express Scripts from continuing to refuse to deal with Irmat.  Irmat also seeks to recover costs of this suit, including reasonable attorneys' fees.

## PARTIES

14.     Plaintiff Irmat is a corporation organized and existing under the laws of the State of New York, with its principal office and place of business located at 2 Park Avenue, New York, New York.

15.     Defendant Express Scripts Holdings Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Express Way, St. Louis, Missouri.

16. Defendant ESI is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Express Way, St. Louis, Missouri.

17. Express Scripts is the largest PBM in the United States, providing services to over 85 million members nationwide. Over 97% of all retail pharmacies in the U.S. participate in Express Scripts' pharmacy network. In April 2012, Express Scripts acquired another large PBM, Medco Health Solutions, Inc. ("Medco"), for over $29 billion. The merger made Express Scripts the largest PBM in the U.S.

18. Express Scripts owns and operates a mail-order pharmacy – the only pharmacy in Express Scripts' network that is permitted by Express Scripts' rules to mail prescriptions to Express Scripts' members.

## CO-CONSPIRATORS

19. Various other persons, firms and corporations, not named as defendants, have participated as co-conspirators with Express Scripts and have performed acts and made statements in furtherance of the conspiracy. Co-conspirators include, but are not limited to, CVS Health, formerly known as CVS Caremark Corp. CVS Health is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. It is the nation's second largest PBM, managing the prescription benefits for over 75 million members nationwide. CVS Health owns and operates approximately five mail-order pharmacies.

20. Express Scripts and its co-conspirators compete in a highly concentrated market for PBM services. Express Scripts and CVS Health alone control approximately 65% of all plan-covered drugs dispensed in the U.S.

6

21.     Various other individuals and entities, known and unknown, and not named in this Complaint, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  Such persons or entities include other PBMs and other persons or entities that stand to benefit from the elimination of mail-order pharmacies from the mail-order pharmacy services market and sub-markets in which Express Scripts and/or its co-conspirators participate.  Such persons or entities aided, abetted, or participated with Express Scripts and the named co-conspirators in the commission of the wrongful acts alleged in this Complaint.

## JURISDICTION AND VENUE

22.     Irmat brings this action, in part, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, for Express Scripts' violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337.

24.     Irmat also brings this action under state law for breach of contract, equitable estoppel, and for violation of state Any Willing Provider statutes.  This Court has original subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interest and costs.  The Court also has jurisdiction over Irmat's state law claims pursuant to 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Express Scripts and venue is proper in the Eastern District of Missouri pursuant to Section 12 of the Clayton Act, 15 U.S.C. §§ 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Irmat's claims occurred

in this District, and Express Scripts transacts business and/or maintains facilities in this District and thus is subject to personal jurisdiction here.  Venue is also proper here because the network participation agreement, which Express Scripts required Irmat to sign, contains a clause designating this Court as the forum for the adjudication of any disputes arising between the parties.

26.     Express Scripts and its co-conspirators are engaged in activities, including those that form the basis of this Complaint, that substantially affect interstate trade and commerce.

## FACTUAL BACKGROUND

### The Pharmaceutical Services Industry

27.     There are a number of players in the pharmaceutical services industry, including drug manufacturers, the doctors who write the prescriptions, the pharmacies that dispense medications, health insurance plans, and patients.

28.     Additionally, there are PBMs.  PBMs are third-party administrators of prescription drug programs.  They are responsible for processing and paying prescription drug claims made by pharmacies and patients.  PBMs manage the pharmacy benefits for health plans and self-insured entities, negotiate drug discounts with pharmaceutical manufacturers, and develop "formularies," which are lists of drugs approved for reimbursement.  Express Scripts is the largest PBM in the United States.  It competes with other large PBMs, including CVS Health, in addition to the smaller players, in the offering of PBM services.

29.     Patients do not choose the PBM that covers their drug-related expenses.  That decision is made by patients' health insurance plans, which also are generally not chosen by patients, but by the patients' employers.

8

30.     PBMs build networks of pharmacies through which PBM members can receive their prescription medications at the "covered" discounted rates.  For a pharmacy that is not owned by a PBM to operate successfully, it is essential for the pharmacy to participate in all of the largest PBMs' networks, including Express Scripts'.

31.     Independent pharmacies contract with PBMs either directly, or indirectly through the independent pharmacy's contracting agent, typically a Pharmacy Services Administrative Organization ("PSAO").  Either way, the PBM contracts are non-negotiable contracts of adhesion that purport to give the PBM the ability to terminate the pharmacy from the PBM's network with or without cause, and to unilaterally amend the contract at any time.  Pharmacies must agree to these onerous terms in order to participate in the PBMs' pharmacy networks – a matter of business necessity for independent pharmacies in the U.S.

32.     Many PBMs – including Express Scripts and its co-conspirators – also own and operate pharmacies providing mail-order pharmacy services.  Pharmacies that provide mail-order pharmacy services supply home-delivered prescriptions without the face-to-face consultation provided by a pharmacist at a brick-and-mortar "retail" pharmacy.  Mail-order pharmacy services offer many benefits that traditional retail pharmacy services do not.  Mail-order pharmacies are typically more cost efficient than retail pharmacies (as they generally have less overhead and a greater potential customer base), provide 24/7 customer service, are able to dispense 90-day supplies of prescription drugs (rather than the typical 30-day supplies dispensed by retail pharmacies), and offer the convenience (and, for many patients who are unable to travel, necessity) of home-delivery.

33.     The mail-order pharmacies of the large PBMs, including Express Scripts and its co-conspirators, dominate the mail-order pharmacy service industry.  Nevertheless, some

independent pharmacies, such as Irmat, are able to provide exceptional mail-order pharmacy services as well.  Thus, every mail order service pharmacy within a PBM's network is either an outright competitor or, at the very least, a potential competitor, to the PBM's own mail-order pharmacy.  The result is a perverse system whereby the PBM has the incentive and the ability to eliminate pharmacies providing competing mail-order pharmacy services by terminating them from the PBM's network.  Express Scripts and its co-conspirators have recently been on a campaign to terminate from their respective pharmacy networks all pharmacies that constitute a significant competitive threat to the PBMs' dominance of the market for mail-order pharmacy services.

**Irmat's Successful Mail-Order Business**

34.     Irmat began its business in 1978 as a community pharmacy located at 2 Park Avenue, New York, New York.  Situated in midtown Manhattan, Irmat has been a local pharmacy for thousands of New York City residents and commuters for over 38 years.  In 1995, Victor Falah, bought Irmat from "Irwin" and "Matthew," from whom the pharmacy got its name.  For nearly 20 years, Mr. Falah operated Irmat as a successful mom and pop pharmacy with a reputation for exceptional customer service.

35.     In 2013, Mr. Falah began concentrating Irmat's efforts on dermatological pharmaceuticals.  Irmat's team of pharmacists and technicians have since become experts in dermatological diseases, medications, and treatments.  Through its expertise and dedication to customer service, Irmat has consistently met the high expectations of dermatology patients.  Irmat's popularity is reflected in the close working relationships that Irmat has formed with dermatologists in the New York metropolitan area.

36.     As Irmat's dermatology business began to flourish, Irmat agreed to participate in patient assistance programs sponsored by leading drug manufacturers.  These companies manufacture popular dermatological drugs, many of which have no generic equivalent.  Under these patient assistance programs, when a patient purchases a drug at Irmat, the manufacturer will cover a portion of the insurance co-payment that a patient is required to pay and which, consistent with the law, Irmat always collects.  These programs thus allow patients to obtain the medications that their doctors prescribe without having to make burdensome (and in some cases, prohibitive) co-payments for them.

37.     Irmat's participation in these programs gave it an opportunity to significantly expand its business.  Whereas Irmat had always operated as a local retail pharmacy, these manufacturers provided Irmat with marketing channels and a potential customer base that extended nationwide.  To service that customer base, Irmat could no longer confine its operations to its Park Avenue storefront.  As such, Irmat began providing mail-order services to customers throughout the country.

38.     Irmat's mail-order business was very successful.  From 2012 to 2015, Irmat's business grew exponentially, both in revenue and geographic scope.  At the time of Irmat's termination, Irmat was licensed in 50 states and the District of Columbia, and is popular with patients and dermatologists from coast-to-coast.  Irmat's staff grew from 20 employees (in 2012) to a high of 208 employees.  Irmat constructed a multi-million-dollar facility in New York (once Express Scripts approved Irmat to continue participation in its network as a mail-order pharmacy in August 2015) through which Irmat conducted its extensive customer service and call-center operations.  Amidst its success, Irmat maintained its one and only storefront at 2 Park Avenue, where it continues to serve its retail customers, as it has done since 1978.

11

39.     Further demonstrating Irmat's excellence in providing mail-order pharmacy services, last year, Irmat obtained Mail Service Pharmacy accreditation from URAC, a prestigious accrediting body in the health care industry, as well as accreditation as a Verified Internet Pharmacy Practice Site ("VIPPS") from the National Association of Boards of Pharmacy.  These are the most rigorous accreditations a mail-order pharmacy can obtain.  They reflect a pharmacy's sterling reliability, regulatory compliance, quality control, customer service, and safety record.  Very few pharmacies in the United States have received both of these accreditations.

**Irmat's Contractual Relationship with Express Scripts**

40.     On or about July 30, 2012, Irmat enrolled with the PSAO AccessHealth.  Through AccessHealth, Irmat gained access to over 100 payors' pharmacy networks, including Express Scripts' network.

41.     On or about October 28, 2014, Defendant ESI sent Irmat a new base Network Provider Agreement.  *See* Ex. 3.  The Agreement was drafted entirely by ESI, and Irmat was given no opportunity to negotiate any of its terms.  ESI's letter accompanying the Agreement stated that, "[e]ffective **June 1, 2014**, Express Scripts requires every pharmacy in the Express Scripts network(s) to have a signed base provider agreement on file."  Ex. 3 at 1 (emphasis in original).  ESI informed Irmat that, even though Irmat was affiliated with a PSAO, failure to sign and return the base agreement could result in Irmat "receiving a breach notification" and "patient disruption."

42.     The Network Provider Agreement was a non-negotiable contract of adhesion.

43.     On or about October 29, 2014, Irmat executed the Network Provider Agreement and provided the signed agreement to ESI.

44.     In July 2015, ESI required Irmat to submit a re-credentialing application for participation in Express Scripts' networks.  Irmat provided that re-credentialing application to ESI on or about July 10, 2015.  *See* Ex. 1.  In the application, Irmat accurately disclosed that 65 percent of Irmat's business was "Mail  Order" and that 95% of Irmat's mail order business was located out-of-state.  *See* Ex. 1 at 5.

45.     On August 7, 2015, ESI sent Irmat an email stating "[w]e are pleased to inform you that ***your recently submitted credentials have been reviewed and you are approved to continue in the Express Scripts Holding Company pharmacy networks.*"  Ex. 2 (emphasis added).

46.     In reliance upon ESI's August 7, 2015 assurance that Irmat could continue to participate in Express Scripts' network as a mail-order pharmacy, Irmat made substantial investments in its mail-order business.  Irmat hired scores of employees, constructed a multi-million dollar facility in New York, and spent considerable time and resources to obtain URAC and VIPPS accreditations.

**Express Scripts Terminates Irmat**

47.     On or about May 18, 2016 – over nine months after ESI, in writing, expressly approved Irmat's continued participation in Express Scripts' network – Express Scripts sent Irmat a cease-and-desist letter.  That letter claimed that Irmat committed several "infractions" of Irmat's contract with Express Scripts.  The primary "infraction" that Irmat supposedly committed, according to Express Scripts, was dispensing medications to Express Scripts members by mail.  Express Scripts' letter wrongly claimed that Irmat misrepresented the nature of its pharmacy operations.  As explained above, Irmat disclosed that 65% of its drug

13

dispensations were by mail-order, which was met with approval from Express Scripts in August 2015.

48.     Express Scripts' letter also erroneously claimed that Irmat had failed to use its best efforts to achieve formulary compliance.  In fact, Irmat dispenses drugs in accordance with law, which affords pharmacies virtually no discretion over whether to dispense brand name or generic drugs.  Under New York law, if a doctor indicates "DAW" (Dispense As Written) on a prescription, the pharmacy filling that prescription must fill the brand name drug that the doctor prescribed.  If the prescription does not indicate "DAW," the pharmacy must substitute a generic equivalent if one exists.  Irmat – a pharmacy located in New York – follows New York law when dispensing its products.

49.     Finally, Express Scripts' letter claimed that Irmat discounted member co-payments – an assertion that was demonstrably false.  Irmat has always collected the full co-payments required by Express Scripts.  The co-payment assistance programs in which Irmat participates with drug manufacturers does not reduce or discount the co-payments Irmat collects. In fact, such co-pay assistance programs – commonly referred to as "coupon" programs – are expressly authorized under Irmat's Agreement with Express Scripts.

50.     Express Scripts' letter demanded that Irmat immediately cease its mail-order pharmacy activities.  Irmat responded to Express Scripts by letter dated June 14, 2016.  Irmat reminded Express Scripts that on August 7, 2015, Express Scripts had informed Irmat that its re-credentialing application was reviewed and approved by Express Scripts.  Irmat explained that it had previously inquired as to whether Express Scripts maintained a separate mail-order pharmacy network, and that Express Scripts had informed Irmat that Express Scripts does not. Irmat, nevertheless, informed Express Scripts that, should Express Scripts establish such a

14

network, Irmat would agree to join it.  Irmat also noted the erroneous assertions contained in

Express Scripts' May 18, 2015 letter concerning formulary compliance and collection of co-

payments.

51.     By letter dated July 15, 2016, Express Scripts notified Irmat that Express Scripts

was terminating Irmat from Express Scripts' pharmacy networks effective September 14, 2016.

The ostensible primary basis for termination was that, due to Irmat's mail-order business, Irmat

failed to meet the definition of a "retail provider" under the Agreement.  Express Scripts also

purported to terminate the contract on the grounds that Irmat violated the Agreement by failing

to use its "best efforts" to dispense formulary drugs.

52.     By letter dated August 8, 2016, Irmat appealed its termination through Express

Scripts' internal appeal process.  Irmat's letter again noted that Express Scripts expressly

approved Irmat's mail-order business, and explained that Irmat, in following New York law, had

been fully compliant with Express Scripts' formularies.  On August 15, 2016, Irmat participated

in a telephonic appeal hearing with Express Scripts employees.

53.     By letter dated August 22, 2016, Express Scripts informed Irmat that Express

Scripts had decided to affirm its decision to terminate Irmat.  Tellingly, for the first time, Express

Scripts asserted in its letter that Express Scripts was terminating Irmat "without cause," in

addition to the other purported for-cause bases.  Express Scripts' letter also cited – for the first

time – three disputes Irmat had resolved with state boards of pharmacy, none of which resulted

in any board of pharmacy taking action against Irmat's licenses.  These minor disputes did not

constitute any grounds for terminating Irmat's contract.  Express Scripts' insertion of them into

the letter was a transparent attempt to establish additional pretextual reasons for terminating

Irmat.

**Irmat's Termination from Express Scripts' Networks Has Caused
Catastrophic Injury to Irmat's Business and Significantly Harmed
Irmat's Express Scripts-Member Customers**

54.     As a result of Express Scripts and its co-conspirators' actions, Irmat has lost and
will continue to lose sales to Express Scripts members, which, prior to termination, constituted a
substantial portion of Irmat's business.

55.     Irmat's injuries have been nothing short of catastrophic.  Irmat's revenues have
plummeted to a fraction of what they were before the Express Scripts termination.  Irmat has
been forced to conduct significant layoffs, as well as abandon the multi-million dollar call center
facility Irmat constructed prior to Irmat's termination.

56.     Irmat's customers have also been significantly harmed.  Prior to termination,
Irmat was filling prescriptions for tens of thousands of Express Scripts members.  These
members have lost the high level of expertise, as well as the mail-order pharmacy services of one
of the few URAC and VIPPS accredited mail-order pharmacies.

57.     In addition, Irmat has many local retail customers that have been receiving
pharmacy services from Irmat for decades, including many elderly patients.  These customers
rely on Irmat's intimate knowledge of their medical conditions and necessary prescriptions in
order to obtain fast and reliable pharmacy services.  These customers simply cannot obtain
comparable service from any other pharmacy because that pharmacy would lack the knowledge
that Irmat has acquired over decades of servicing the customer, and may not carry some of
Irmat's less-common medications.

## ANTITRUST ALLEGATIONS

58.     Express Scripts and its co-conspirators combined, conspired, and engaged in a
concerted effort to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1, *et seq.*, to eliminate Irmat and other independent mail-order pharmacies as competitors in the relevant markets.

59.     Express Scripts also has unlawfully monopolized the relevant markets, and has unlawfully exercised its monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.*, to eliminate Irmat and other independent mail-order pharmacies as competitors in the relevant markets.

**Interstate Commerce**

60.     The provision of mail-order pharmacy services, and the insurance coverage for such services, are each in, and affect, interstate commerce.

61.     Many of the activities of Express Scripts and its co-conspirators in administering the prescription drug benefits for employers, unions, and health plans in every state are in the regular, continuous, and substantial flow of interstate commerce, and have a substantial effect on interstate commerce.

62.     Many of the conspiratorial and anticompetitive acts alleged herein undertaken by Express Scripts and its co-conspirators had, and continues to have, a direct, substantial, and reasonably foreseeable impact on interstate commerce.

**Anticompetitive Conduct**

63.     Express Scripts and its co-conspirators have the ability to exclude pharmacies from providing mail-order pharmacy services.  These PBMs act as third-party administrators of the overwhelming majority of prescription drug programs.  They establish networks of pharmacies, and process and pay prescription drug claims for those pharmacies.  Due to Express Scripts and its co-conspirators' market heft, covering hundreds of millions of persons, mail-order

17

pharmacies that have no PBM ownership, such as Irmat, must be a member of these PBMs' networks in order to remain viable.

64.     Since it began its mail-order operations in 2013, Irmat's business has thrived. Until May 2016, Express Scripts reimbursed Irmat's mail-order sales without providing any indication that Irmat could be in violation of Express Scripts' rules.  In fact, in August 2015, Express Scripts explicitly approved Irmat's participation as a mail-order pharmacy in Express Scripts' pharmacy networks.  It was only when Irmat's business achieved a level substantial enough to pose a serious competitive threat to Express Scripts that Express Scripts decided to terminate Irmat.

65.     Express Scripts' termination has no legitimate purpose or offsetting procompetitive impact.  Irmat is a URAC and VIPPS accredited mail-order pharmacy.  At the time of Irmat's termination, it was licensed to provide mail-order pharmacy services in all 50 states and the District of Columbia.  Irmat is fully compliant with all federal and state regulations.  Irmat is popular both with Express Scripts' members, and dermatologists nationwide.  Irmat possesses unique expertise in the field of dermatological pharmaceuticals, and has always made an exceptional commitment to customer service.

66.     The sole purpose behind Express Scripts' termination decision is to eliminate Irmat as a competitor to Express Scripts' and its co-conspirators' own mail-order pharmacies.

**Relevant Markets**

67.     A relevant product market in this case is the market for mail-order pharmacy services.

68.     The market for mail-order pharmacy services is a relevant market because few, if any, feasible alternatives exist to consumers of such services.  Such consumers, particularly those

18

that live in rural areas, often do not live within close proximity to a brick-and-mortar "retail" pharmacy that can provide the prescribed medication.  For these consumers, mail-order pharmacies are the only reasonable means of purchasing their medications.  In addition, retail pharmacies generally do not provide the same level of convenience that mail-order pharmacies can provide.  A hypothetical monopolist of mail-order pharmacy services could therefore raise the price of drugs that they dispense in a small, but significant, non-transitory manner.

69.     There is also a relevant sub-market in this case: the market for mail-order pharmacy services to Express Scripts members.

70.     The market for mail-order pharmacy services to Express Scripts members is a relevant product market since few, if any, feasible alternatives exist to consumers of such services.  Prescription drugs dispensed by mail-order pharmacies that are not part of the Express Scripts network are not economic substitutes for prescription drugs dispensed by mail-order pharmacies that are part of the Express Scripts network for Express Scripts members.  As a general matter, Express Scripts' millions of members have coverage for prescription medications solely through Express Scripts.  It is therefore much more expensive for the vast majority of Express Scripts members to obtain prescription drugs from pharmacies outside of Express Scripts' networks.  In the very least, the "out of pocket" costs for Express Scripts members to fill prescriptions at non-Express Scripts-owned pharmacies are substantially higher, making it exceedingly unlikely for Express Scripts members to fill their prescriptions "out of network."  As such, if an Express Scripts member seeks to purchase mail-order pharmacy services, there is no reasonable alternative to purchasing those services from a pharmacy within Express Scripts' network.

71.     Express Scripts members are "locked into" using pharmacies in the Express Scripts network for the dispensation of their prescribed medications based on the fact that their health plan has chosen to use Express Scripts as a PBM.  Most Express Scripts members obtain their health insurance coverage based on the decisions made by their employer in which the members have no say: these members are not effectively given any choice over the health plan that covers their medical expenses.  These members are thus forced to use Express Scripts network pharmacies in order to obtain necessary drugs.

72.     The costs for Express Scripts members to switch PBMs are extremely high.  To do so, they would have to purchase a health insurance policy on the open market (for themselves and their family), despite that their employers may subsidize the cost of health insurance as part of their compensation.  They would then have to choose a health plan based solely on the PBM that the health plan based chooses to use.  Accordingly, virtually no Express Scripts members attempt to change PBMs when Express Scripts choose to terminate a pharmacy from its network, even if that pharmacy was the preferred pharmacy that such Express Scripts members frequented.  Simply put, Express Scripts members are "locked in" to having their medications covered by Express Scripts as opposed to other PBMs, notwithstanding Express Scripts' anticompetitive tactics.

73.     The relevant geographic market for both the mail-order pharmacy services market and the sub-market for mail-order pharmacy services to Express Scripts members is the United States.  There are numerous federal laws restricting consumers from obtaining prescription drugs from countries outside of the United States.  In addition, purchasing prescription medications from abroad poses a serious safety risk.  The Food and Drug Administration is unable to regulate pharmaceuticals manufactured and/or shipped beyond our borders.  Thus, international outlets

may dispense expired, subpotent, contaminated, or counterfeit medication, the wrong or a contraindicated medication, an incorrect dose, or medication unaccompanied by adequate directions for use.  Further, the labeling of the drug may not be in English and therefore important information regarding dosage and side effects may not be available to the consumer.  The drugs may not have been packaged and stored under appropriate conditions to avoid degradation.  There is no assurance that these products were manufactured under current good manufacturing practice standards.  When consumers take such unsafe or inappropriate medications, they face risks of dangerous drug interactions and other serious health consequences.  As such, few, if any, insured consumers would choose to obtain mail-order pharmacy services outside of the United States, even if faced with a price increase or a reduction in quality of such services – demonstrating that the geographic dimensions of the relevant market is no larger than the United States.

**Market Power**

74.    Express Scripts, individually and jointly with its co-conspirators, has market power in the market for mail-order pharmacy services.  This market power derives from their ability to control the market as PBMs.  These PBMs act as third-party administrators of the overwhelming majority of prescription drug programs in the United States.  They collectively act as the PBMs for hundreds of millions of individuals nationwide.  Subject to the "Any Willing Provider" laws of certain states, these PBMs each have the unilateral and unchecked authority to decide which pharmacies will be eligible to participate in these PBMs' respective networks and receive reimbursement for prescription sales to their hundreds of millions of members.  These PBMs also own and operate mail-order pharmacies.

21

75.     The PBM industry is highly concentrated.  Upon information and belief, PBMs manage 95% of all the drugs prescribed and covered under group and individual health plans in the country.  Express Scripts, CVS Health, and the two other largest PBMs control approximately 80% of the PBM market.  Express Scripts and CVS Health alone cover 65% of this market.  This degree of concentration is evidence that Express Scripts and its co-conspirators have market power when they act in concert.

76.     Express Scripts and its co-conspirator PBMs each own and operate their own mail-order pharmacies.  These PBM-owned pharmacies dispense the overwhelming majority of mail-order prescriptions in the United States.

77.     Express Scripts has monopoly power in the sub-market for mail-order pharmacy services to Express Scripts members.  Express Scripts members cannot effectively switch PBMs when Express Scripts raises co-pay costs or terminates their preferred pharmacies from the Express Scripts network.  Express Scripts is the largest PBM in the United States, acting as the PBM for over 85 million individuals nationwide.  Express Scripts also operates its own mail-order pharmacy, which dispenses a monopoly share of mail-order prescriptions covered by Express Scripts' networks.

78.     Express Scripts has, subject to the "Any Willing Provider" laws of certain states, the unilateral and unchecked authority to decide which pharmacies will be able to participate in Express Scripts' networks and be eligible to receive reimbursement for prescription sales to Express Scripts' 85 million members.  Mail-order pharmacies in the United States that are not enrolled in Express Scripts' pharmacy networks are thus effectively foreclosed from competing with other mail-order pharmacies – including Express Scripts' own – for the provision of mail-order pharmacy services to Express Scripts members.

22

**Harm to Competition**

79.     Express Scripts' wrongful termination of Irmat has harmed competition and will continue to harm competition by diminishing quality and increasing price in the relevant markets.

80.     Express Scripts' illegal conduct has prevented customers and will prevent customers from obtaining the benefit of competitive pharmacy expertise, as it has and will continue to result in substantial pharmacy foreclosure.  It deprives customers, specifically, of Irmat's URAC and VIPPS accredited services, expertise in dermatological drugs, and exceptional customer service.  For instance, Express Scripts members likely have been forced to purchase mail-order pharmacy services from Express Scripts' own mail-order pharmacy, because, as far as Irmat is aware, there are no other significant mail-order pharmacies in Express Scripts' network.  Express Scripts' own mail-order pharmacy lacks Irmat's dermatological expertise, and consistently receives poor reviews from members regarding its customer service.

81.     Express Scripts' anticompetitive conduct has also resulted in higher prices for patients.  And it will continue to do so.  Terminating Irmat, for example, deprives consumers of the cost-saving benefits that they enjoy through Irmat's participation in drug manufacturer patient assistance programs.  Express Scripts' mail-order pharmacy will not accept the promotional benefits offered by these manufacturers.  As a result, Express Scripts members will be forced to pay an expensive co-payment to obtain these pharmaceuticals through mail-order, or will be steered toward medications other than those prescribed by the patients' doctors.  For many Express Scripts members with lower incomes, the elimination of this co-payment benefit deprives them of the ability to obtain these medications for treatment altogether.

**Concerted Action by Express Scripts and Its Co-conspirators to Unreasonably Restrain Trade in the Market for Mail-Order Pharmacy Services**

82.     Express Scripts and its co-conspirators combined, conspired, and agreed to unreasonably restrain trade in the market for mail-order pharmacy services by, among other actions, entering into a horizontal agreement to boycott and/or refuse to deal with Irmat and other independent mail-order pharmacies.

83.     Express Scripts and its co-conspirators are, and at all relevant times have been, active members of the Pharmaceutical Care Management Association ("PCMA"), a trade association representing PBMs.

84.     Executives from Express Scripts and its co-conspirators serve on the PCMA's board of directors, including Tim Wentworth (President of Express Scripts), and Jon Roberts (President, CVS/Caremark and & Executive Vice President of CVS Health).

85.     The PCMA's own statements make clear that the PCMA facilitates communication and collaboration among PBMs to "shape the industry's direction" and "explore collaborative solutions" to industry issues.  For example, the PCMA boasts that:

a.  "PCMA's members shape the industry's direction and positions on a broad range of public policy issues that affect your business.  No other trade group in America has more depth and influence on PBM issues." (http://www.pcmanet.org/about/members/become-a-member)

b.  "PCMA's Membership includes PBM CEOs and other industry leaders.  Becoming a PCMA Member puts you in touch with this motivated and influential group of leaders that is shaping the future of PBMs

nationwide." (http://www.pcmanet.org/about/members/become-a-member)

    c.   "PCMA has tremendous access to policymakers, regulators, health care media and other key individuals who determine the role and image of PBMs in the public policy process. Through PCMA, many PBMs are enhancing their relations with these influential people." (http://www.pcmanet.org/about/members/become-a-member)

    d.   "PCMA provides one-of-a-kind conference events that bring together PBM industry leaders and their partners in pharmaceutical care to explore collaborative solutions to issues such as e-prescribing, specialty pharmacy, and Medicare Implementation." (http://www.pcmanet.org/about/members/become-a-member)

86.    The PCMA hosts meetings and summits at which PCMA members convene to discuss industry issues and strategies for addressing those issues.

87.    Express Scripts and its co-conspirators joined together in approximately 2014 – through the PCMA and/or otherwise – to collectively determine how best to eliminate coverage for the provision of mail-order pharmacy services by independent pharmacies.

88.    Express Scripts and it co-conspirators joined together to exclude independent mail-order pharmacies from the relevant market by employing anti-competitive means. Each PBM drew from the same playbook of tactics, which included:

    a.   terminating Irmat and other independent pharmacies;

b. forcing independent pharmacies to sign boilerplate contracts of adhesion that purport to prohibit pharmacies from providing mail-order pharmacy services to members;

c. unilaterally amending – without pharmacies' knowledge or consent – the co-conspirators' contracts with PSAOs to prohibit the PSAO's pharmacies from providing mail-order pharmacy services;

d. undertaking abusive pharmacy audits with the hidden objective of establishing pretextual bases for termination;

e. forming separate mail-order pharmacy networks that have significantly lower reimbursement rates than the PBMs' "retail" pharmacy networks – rates that often reimburse independent mail-order pharmacies at below their costs; and

f. informing members that they could no longer obtain coverage at certain independent mail-order pharmacies – even when those pharmacies had not been terminated from the PBM's network.

89. Other independent pharmacies that have been the victims of these tactics by Express Scripts and its co-conspirators have filed suit in this District. *See*, *e.g.*, *Precision Rx Compounding, LLC, et al. v. Express Scripts Holding Company, et al.*, No. 4:16-cv-0069 (CEJ); *HM Compounding Services, LLC and HMX Services, LLC v. Express Scripts, Inc.*, No. 4:14-cv-01858 (JAR); *Grasso Enterprises, LLC, d/b/a Annie's Apothecary, et al. v. Express Scripts, Inc.*, No. 4:14-cv-1932 (HEA). These suits have proceeded into discovery after motions to dismiss brought by Express Scripts have been denied.

90.     Irmat has been in business for over 38 years.  Yet, over the past year and a half, Express Scripts and its co-conspirators have bombarded Irmat with the anticompetitive tactics described above.

91.     Most recently, by letter dated January 20, 2017, CVS Health notified Irmat that CVS Health would terminate Irmat from CVS Health's pharmacy networks.  Since at least July 2012, Irmat had been a participant in CVS Health's pharmacy networks.  Since then CVS Health, for a numbers of years, subjected Irmat to repeated, meritless audits of the claims that Irmat filed with CVS Health with respect to sales made to CVS Health members.  Again and again, Irmat was forced to show that its claims were valid and that it dispensed its drugs according to the highest of standards.  Hereafter, on or about August 30, 2016, CVS Health furnished Irmat with a boilerplate contract of adhesion requiring Irmat to participate in CVS Health's mail-order pharmacy network.  Nonetheless, upon entering the CVS Health mail-order pharmacy network, CVS Health began reimbursing Irmat at rates well below what Irmat had received prior to joining the mail-order network.  CVS Health also refused to allow Irmat to dispense 90-day supplies of prescriptions.  CVS Health's own mail-order pharmacy receives more favorable reimbursement rates than Irmat, and is able to dispense 90-day supplies to CVS Health members.

92.     Yet, despite the unfair and abusive reimbursement terms that CVS Health imposed upon Irmat, Irmat remained in CVS Health's mail-order network.  Having failed to drive Irmat out of the network and failing to find that Irmat had engaged in any contractual breaches, despite the repeated audits to which Irmat was subjected, CVS Health simply terminated Irmat in January 2017.  CVS Health's notice of termination did not cite any rule or provisions that Irmat had supposedly violated.

27

93.     There is no legitimate reason why Irmat and other independent pharmacies should be prohibited from providing mail-order pharmacy services, particularly when they, like Irmat, have been accredited by the most prestigious bodies to do so.  The large PBMs have prohibited these pharmacies from mail-order activities for only one reason: to shield the tremendous profits made by the pharmacies owned by the co-conspirator PBMs from competition.

94.     The agreement between Express Scripts and its co-conspirators can also be inferred because of:

a.   The timing, specifics, and similarity of anticompetitive conduct by Express Scripts and its co-conspirators;

b.   Their common motive to enter or further their interests in the market for mail-order pharmacy services;

c.   They are all members – in fact board members – of the primary trade association acting on behalf of PBMs.  That trade association provided numerous opportunities to meet, communicate, and adjust their coordinated policies;

d.   The pretextual and misleading reasons for their conduct;

e.   The consolidation and concentration of the PBM market, which has drastically reduced the number of PBMs and therefore made it far easier to coordinate; and

f.   The history of enforcement actions and litigation regarding collusion in the industry.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (*Per Se* or Rule of Reason Group Boycott in the Market for Mail-Order Pharmacy Services)

95.     Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

96.     Express Scripts, along with its co-conspirators, has entered into continuing illegal contracts, combinations or conspiracies in restraint of trade, the purpose and effect of which are to eliminate competition from independent pharmacies providing mail-order pharmacy services in the United States.

97.     These contracts, combinations, agreements or conspiracies are illegal both *per se* and under the Rule of Reason under Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.     Express Scripts and its co-conspirators collectively possess and exercise market power in the market for mail-order pharmacy services in the United States.

99.     These contracts, combinations or conspiracies have caused substantial anticompetitive effects.

100.    These contracts, combinations or conspiracies have excluded competition from independent pharmacies providing mail-order pharmacy services, have reduced the quality of pharmacy services available to consumers, and have caused an increase in price of pharmaceuticals to consumers.

101.    These contracts, combinations or conspiracies have no legitimate business purpose or offsetting procompetitive compact.

102.    These contracts, combinations or conspiracies achieve no legitimate efficiency

benefit to counterbalance the anticompetitive effects they cause.

103.    As a result of these violations of Section 1 of the Sherman Act, Irmat has been

injured in its business and property in an amount not presently known.

### SECOND CLAIM FOR RELIEF

### (Monopolization of the Market for Mail-Order
### Pharmacy Services to Express Scripts Members)

104.    Irmat repeats and realleges each and every allegation of this Complaint as if fully

set forth herein.

105.    Express Scripts has acquired and maintains monopoly power in the sub-market

for mail-order pharmacy services to Express Scripts members.  Express Scripts is the sole arbiter

of which pharmacies may or may not provide mail-order pharmacy services to Express Scripts'

millions of members.  Express Scripts – as a PBM – has the power to exclude pharmacies from

the relevant sub-market completely.  This has allowed Express Scripts – as an owner and

operator of a mail-order pharmacy – to achieve monopoly power in the relevant sub-market.

Express Scripts has exercised its monopoly power to exclude competition in the sub-market for

mail-order pharmacy services to Express Scripts members.

106.    Express Scripts' termination of Irmat has substantial anticompetitive effects.

Express Scripts' illegal conduct will prevent its millions of members from obtaining the benefit

of Irmat's expertise in dermatological pharmaceuticals, as well as Irmat's renowned exceptional

customer service.  It will also result in an increase in price to consumers of many of the

pharmaceuticals produced by Irmat's manufacturing partners.  Express Scripts' millions of

members will lose their ability to obtain these pharmaceuticals through mail-order via the manufacturer coupon programs offered by Irmat.

107.    There is no legitimate business purpose or offsetting procompetitive impact resulting from the foreclosure of competition caused by Express Scripts.

108.    Irmat has suffered and will continue to suffer injury as a direct and proximate result of Express Scripts' exclusionary conduct.  Irmat has been forced to discontinue sales to a substantial portion of its customer base, and may be run out of business entirely.  Irmat has suffered antitrust injury from Express Scripts' acts of monopolization.

109.    Express Scripts' unlawful acquisition and maintenance of monopoly power constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

## THIRD CLAIM FOR RELIEF

### (*Per Se* or Rule of Reason Tying in Violation of the Sherman Act

110.    Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

111.    Express Scripts has engaged in contracts, agreements, and/or arrangements whereby Express Scripts has limited the sale of a distinct "tying" product – namely, retail pharmacy services to Express Scripts members – to pharmacies, including Irmat, which agree, albeit under coercion or unwittingly, to refrain from selling a product – namely, mail-order pharmacy services to Express Scripts members.

112.    At all relevant times, Express Scripts has had market power in the national markets for retail pharmacy services and for mail-order pharmacy services, as well as in the national sub-markets for retail pharmacy services to Express Scripts members and for mail-order

31

pharmacy services to Express Scripts members.  Express Scripts members are locked into using pharmacies in the Express Scripts network for the dispensation of their drugs based on the fact that their health plan has chosen to use Express Scripts as a PBM.  Most Express Scripts members obtain their health insurance coverage based on the choices of their employer: these members are not effectively given any choice over the health plan that covers their medical expenses.  These members are thus forced to use Express Scripts network pharmacies in order to obtain necessary drugs.

113.    Express Scripts has exercised its market power to force its retail pharmacy network members to refrain from dispensing drugs via mail-order delivery.

114.    This tying arrangement has had and will have substantial anticompetitive impact in the market for mail-order pharmacy services and in the sub-market for mail-order pharmacy services to Express Scripts members.  Express Scripts' illegal conduct has foreclosed and will continue to foreclose competition and thereby prevent its 85 million members from obtaining the benefit of competitive pharmacy expertise in drug dispensation.  Specifically, it has prevented and will continue to prevent patients from enjoying the benefit of Irmat's expertise in dermatological pharmaceuticals, as well as Irmat's renowned exceptional customer service.  It also has resulted and will result in price increases to consumers of many of the pharmaceuticals produced by Irmat's manufacturing partners.  Express Scripts' 85 million members will lose the ability to obtain these pharmaceuticals through mail-order via the manufacturer programs offered by Irmat.

115.    Irmat has suffered and will continue to suffer injury as a direct and proximate result of Express Scripts' exclusionary conduct.  Irmat has been forced to discontinue to sales to

a substantial portion of its customer base.  Irmat will suffer antitrust injury from the illegal and unreasonable tying arrangement.

116.    The tying arrangement constitutes a contract, combination, and/or conspiracy violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract)

117.    Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

118.    On or about October 28, 2014, Irmat entered into the Agreement with Express Scripts whereby Irmat enrolled in Express Scripts' pharmacy network.  That contract was a non-negotiable contract of adhesion drafted entirely by Express Scripts.

119.    On or about July 10, 2015, Irmat submitted – at Express Scripts' request – a re-credentialing application that notified Express Scripts that 65% of Irmat's business constituted mail-order pharmacy services.  On or about August 7, 2015, Express Scripts provided Irmat with an express written approval of Irmat continuing its mail-order business as a participant in Express Scripts' pharmacy network.

120.    Express Scripts' August 7, 2015 communication constituted a novation of the parties' Agreement.  The terms of that novation eliminated any and all restrictions in the Agreement on Irmat's provision of mail-order pharmacy services to Express Scripts members.

121.    Irmat has complied with all of the contractual obligations.

122.    Express Scripts' termination of the Agreement for cause on the purported bases that (1) Irmat provides mail-order pharmacy services to Express Scripts members; (2) Irmat failed to comply Express Scripts' formulary; (3) Irmat failed to collect full copayments; (4) Irmat

failed to make required disclosures to Express Scripts; and (5) any other ostensible basis for cause constitutes a breach of contract.

123.    Express Scripts' decision to terminate Irmat also violates the implied covenant of good faith and fair dealing inherent in every contract.

124.    As a direct and proximate cause of Express Scripts' breaches of its contractual obligations, Irmat has suffered and continues to suffer substantial monetary harm.

## FIFTH CLAIM FOR RELIEF

### (Equitable Estoppel)

125.    Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

126.    Express Scripts is precluded by the doctrine of equitable estoppel from terminating Irmat on the purported basis that Irmat provides mail-order pharmacy services to Express Scripts members. Express Scripts' August 7, 2015 approval of Irmat's re-credentialing application was a clear manifestation of intent to allow Irmat to continue to provide mail-order pharmacy services to Express Scripts members.

127.    Irmat relied to its detriment on Express Script's manifestation of intent. In so doing, Irmat made significant investments to expand its business. For instance, Irmat's employees grew in number from 20 in 2012, to a high of 208 in 2015. Irmat also constructed a multi-million-dollar facility in Brooklyn to conduct its mail-order operations. Irmat invested substantial money and resources to obtain URAC and VIPPS accreditations. But not for Express Scripts' conduct, Irmat would not have undertaken such substantial investments to expand its business.

## SIXTH CLAIM FOR RELIEF

### (Violation of Georgia State Any Willing Provider Law)

128.    Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

129.    Since at least September 30, 2016, Express Scripts has administered prescription drug programs within the state of Georgia that, *inter alia*, permit Express Scripts' own mail-order pharmacy to dispense prescriptions to Express Scripts members by mail.

130.    Since at least September 30, 2016, Irmat has been a licensed non-resident pharmacy in the state of Georgia and has dispensed prescriptions to customers in Georgia.

131.    Through its illegal termination of Irmat, Express Scripts has denied Irmat's participation in the prescription drug programs Express Scripts administers in the state of Georgia.

132.    Express Scripts' termination of Irmat violates Georgia's Any Willing Provider laws, including Georgia Code § 26-4-144.

## SEVENTH CLAIM FOR RELIEF

### (Violation of Mississippi State Any Willing Provider Law)

133.    Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

134.    Since at least September 30, 2016, Express Scripts has administered prescription drug programs within the state of Mississippi that, *inter alia*, permit Express Scripts' own mail-order pharmacy to dispense prescriptions to Express Scripts members by mail.

135.    Since at least September 30, 2016, Irmat has been a licensed non-resident pharmacy in the state of Mississippi and has dispensed prescriptions to customers in Mississippi.

136.    Through its illegal termination of Irmat, Express Scripts has denied Irmat's participation in the prescription drug programs Express Scripts administers in the state of Mississippi.

137.    Express Scripts' termination of Irmat violates Mississippi's Any Willing Provider laws, including Mississippi Code § 83-9-6.

## EIGHTH CLAIM FOR RELIEF

### (Violation of North Carolina State Any Willing Provider Law)

138.    Irmat repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

139.    Since at least September 30, 2016, Express Scripts has administered prescription drug programs within the state of North Carolina that, *inter alia*, permit Express Scripts' own mail-order pharmacy to dispense prescriptions to Express Scripts members by mail.

140.    Since at least September 30, 2016, Irmat has been a licensed non-resident pharmacy in the state of North Carolina and has dispensed prescriptions to customers in North Carolina.

141.    Through its illegal termination of Irmat, Express Scripts has denied Irmat's participation in the prescription drug programs Express Scripts administers in the state of North Carolina.

142.    Express Scripts' termination of Irmat violates North Carolina's Any Willing Provider laws, including North Carolina General Statutes § 58-51-37.

## DEMAND FOR RELIEF

**WHEREFORE**, Irmat respectfully demands:

A.      that the Court declare, adjudge, and decree that Express Scripts has committed the violations of law alleged herein;

B.      that the Court award damages sustained by Irmat because of Express Scripts' misconduct, in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees, and costs of suit;

C.      that the Court enjoin Express Scripts and its co-conspirators from continuing to refuse to deal with Irmat;

D.      that the Court grant such other and further relief as it may deem just and proper.

## JURY DEMAND

Irmat hereby demands trial by jury of all issues properly triable thereby.

Dated: St. Louis Missouri
March 20, 2017

**FOX GALVIN LLC**

By: ____/s/ Richard B. Korn____
Richard B. Korn
One South Memorial Drive
Twelfth Floor
St. Louis, Missouri 63102
(314) 588-7000

**CONSTANTINE CANNON LLP**
Matthew L. Cantor
Robert L. Begleiter
David A. Scupp
335 Madison Avenue
New York, New York 10017
(212) 350-2700

*Counsel for Park Irmat Drug Corp.*