IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| PARK IRMAT DRUG CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:17-cv-979 |
| | ) | |
| EXPRESS SCRIPTS HOLDING COMPANY | ) | |
| and EXPRESS SCRIPTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |


**PLAINTIFF PARK IRMAT DRUG CORP.'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**


**FOX GALVIN LLC**
Richard B. Korn, #54570MO
One South Memorial Drive
Twelfth Floor
St. Louis, Missouri 63102
(314) 588-7000


**CONSTANTINE CANNON LLP**
Matthew L. Cantor (*pro hac vice*)
David A. Scupp (*pro hac vice*)
335 Madison Avenue
New York, New York 10017
(212) 350-2700

*Counsel for Park Irmat Drug Corp.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

    A.    The Parties ....................................................................................... 4

    B.    Irmat's Contractual Relationship with Express Scripts ......................... 6

    C.    Express Scripts and Co-Conspirator PBMs Conspired to Suppress Competition from Irmat and Other Independent Mail-Order Pharmacies. ................................. 7

ARGUMENT ................................................................................................................ 8

I.     Relevant Standards .......................................................................................... 8

II.    Irmat's Breach of Contract Claim Satisfies Relevant Pleading Standards. ........ 8

    A.    Express Scripts Breached the Parties' Novated Agreement. .................. 8

    B.    Express Scripts Breached the Covenant of Good Faith and Fair Dealing. .......... 11

    C.    The NPA's One-Sided At-Will Termination Provision Is Unconscionable. ........ 12

III.   The Complaint Sufficiently Pleads an Estoppel Claim .................................... 14

IV.   Irmat's Antitrust Claims Satisfy Relevant Pleading Standards. ...................... 15

    A.    Express Scripts has Participated in an Antitrust Conspiracy that Violates Section 1. ..................................... 15

    B.    Express Scripts Has Engaged in Illegal Acts That Violate Section 2 ................. 18

    C.    Express Scripts Has Engaged in *Per Se* Illegal Tying. ........................ 23

V.    The Complaint Sufficiently Pleads Claims for Violation of State AWP Laws ............... 25

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ............................................................................................. 3, 23

*Baxley-DeLemar Monuments, Inc. v. American Cemetery Ass'n*,
   938 F.2d 846 (8th Cir. 1991) ................................................................................. 24

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 8

*BJC Health Sys. v. Columbia Cas. Co.*,
   478 F.3d 908 (8th Cir. 2007) ................................................................................. 11

*Boswell v. Panera Bread Co.*,
   No. 4:14-cv-01833-AGF, 2016 U.S. Dist. LEXIS 38232 (E.D. Mo. Mar. 24, 2016) ............. 10

*Brewer v. Mo. Title Loans*,
   364 S.W.3d 486 (Mo. 2012) ............................................................................. 12, 13

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
   140 F.3d 494 (3d Cir. 1998) .................................................................................. 20

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) .............................................................................................. 21

*Butano v. Fargo*,
   No. 4:13-CV-1652(HEA), 2014 U.S. Dist. LEXIS 93708 (E.D. Mo. July 10, 2014) ............. 14

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ................................................................................. 23

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
   781 F.3d 264 (6th Cir. 2015) ................................................................................. 20

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*,
   2015 U.S. Dist. LEXIS 168581 (M.D. Fla. Nov. 4, 2015) .................................... 20

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
   748 F.3d 249 (5th Cir. 2014) ............................................................................ 13, 14

*Double D Spotting Serv. v. SuperValu, Inc.*,
   136 F.3d 554 (8th Cir. 1998) ................................................................................. 20

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992) ........................................................................................ passim

*Emerick v. Mut. Benefit Life Ins. Co.*,
   756 S.W.2d 513 (Mo. 1988) .................................................................................. 13

*Evergreen Partnering Grp. Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ................................................................................... 16

ii

*Fortner Enters. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969) ................................................................................ 24

*FTC v. Whole Foods Market, Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) .............................................................. 21

*Fuller v. TLC Prop. Mgmt., LLC*,
   402 S.W.3d 101 (Mo. Ct. App. 2013) ..................................................... 12

*Glenn v. HealthLink HMO, Inc*,
   360 S.W.3d 866 (Mo. Ct. App. 2012) ..................................................... 13

*Grasso Enters., LLC v. Express Scripts, Inc.*,
   No. 4:14-CV-1932 HEA, 2017 U.S. Dist. LEXIS 9998
   (E.D. Mo. Jan. 25, 2017) .................................................................. 15, 16

*Health Related Servs., Inc. v. Golden Plains Convalescent Ctr., Inc.*,
   705 S.W.2d 499 (Mo. Ct. App. 1985) ....................................................... 8

*HM Compounding Servs., Inc. v. Express Scripts, Inc.*,
   4:14-CV-1858 JAR, 2015 U.S. Dist. LEXIS 89062 (E.D. Mo. July 9, 2015) .................. passim

*HM Compounding Servs., LLC v. Express Scripts, Inc.*,
   No. 4:14-CV-1858 JAR, 2017 U.S. Dist. LEXIS 73956 (E.D. Mo. May 16, 2017) ............... 11

*Hopkinton Drug, Inc. v. CaremarkPCS, L.L.C.*,
   77 F. Supp. 3d 237 (D. Mass. 2015) ........................................................ 13

*In re Musical Instruments & Equipment Antitrust Litigation*,
   798 F.3d 1186 (9th Cir. 2015) ............................................................... 17

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) ...................................................... 21

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ................................................................ 16

*In re Travel Agent Commission Antitrust Litigation*,
   583 F.3d 896 (6th Cir. 2009) ................................................................ 17

*In re Visa Check/MasterMoney Antitrust Litig.*,
   No. 96-cv-5238(JG), 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. April 1, 2003) ................ 24

*Jacobs v. Physicians Weight Loss Center of America, Inc.*,
   620 S.E.2d 232 (N.C. Ct. App. 2005) ...................................................... 25

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................... 17

*Laclede Gas Co. v. Amoco Oil Co.*,
   522 F.2d 33 (8th Cir. 1975) ................................................................. 13

*Little Rock Cardiology Clinic, PA v. Baptist Health*,
   591 F.3d 591 (8th Cir. 2009) ................................................................ 20

*Margolies v. McCleary, Inc.*,
  447 F.3d 1115 (8th Cir. 2006) ............................................................................... 12

*Martin v. Prier Brass Mfg. Co.*,
  710 S.W.2d 466 (Mo. Ct. App. 1986) ................................................................... 11

*Mississippi State & School Employees' Life and Health Plan v. KCC, Inc.*,
  108 So. 3d 932 (Miss. 2013) ................................................................................. 25

*Newcal Indus. v. IKON Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................... 20

*Nat. Surety Corp. v. Prairieland Const., Inc.*,
  354 F. Supp. 2d 1032 (E.D. Mo. 2004) ................................................................ 10

*N. Pac. Ry Co. v. United States*,
  356 U.S. 1 (1958) .................................................................................................. 23

*Park Irmat Drug Corp. v. OptumRx, Inc.*,
  152 F. Supp.3d 127 (S.D.N.Y. 2016) ............................................................... 23-24

*Precision Rx Compounding v. Express Scripts Holding Co.*,
  No. 4:16-cv-0069 (CEJ), 2016 U.S. Dist. LEXIS 112851 (E.D. Mo. Aug. 24, 2016) ....... 15, 16

*Prime Aid Pharmacy Corp. v. Humana Inc.*,
  No. 16-cv-2104, slip op. (D.N.J. Mar. 2, 2017) .................................................... 19

*Saey v. Xerox Corp.*,
  31 F. Supp. 2d 692 (E.D. Mo. 1998) .................................................................... 14

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ............................................................................ 16, 17

*State ex rel. Premier Mktg. v. Kramer*,
  2 S.W.3d 118 (Mo. Ct. App. 1999) ....................................................................... 10

*SuperTurf, Inc. v. Monsanto Co.*,
  660 F.2d 1275 (8th Cir. 1981) .............................................................................. 21

*Tockstein v. Spoeneman*,
  No. 4:07cv00020-ERW, 2009 U.S. Dist. LEXIS 60024 (E.D. Mo. July 14, 2009) ........... 12

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ................................................................................. 22

*Turner v. Ferguson*,
  149 F.3d 821 (8th Cir. 1998) ................................................................................ 12

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ................................................................................. 24

*Uptown Drug Co. v. CVS Caremark Corp.*,
  962 F. Supp. 2d 1172 (N.D. Cal. 2013) ............................................................... 14

*Verizon Commc'ns, Inc. v. Law Office of Curtis V. Trinko*,
  540 U.S. 398 (2004) ........................................................................................ 22, 23

iv

*W. Crawford Smith, Inc. v. Watkins*,
  425 S.W.2d 276 (Mo. Ct. App. 1968) .................................................... 8

*Wholesale Grocery Prods. Antitrust Litig. v. DeLuca's Mkt. Corp.*,
  752 F.3d 728 (8th Cir. 2014) ................................................................ 22

*Wolfson v. Balt. Bank of Kan. City*,
  157 S.W.2d 560 (Mo. Ct. App. 1942) .................................................... 8

*Woods v. QC Fin. Servs.*,
  280 S.W.3d 90 (Mo. Ct. App. 2008) ..................................................... 13

## **Statutes**

215 Ill. Comp. Stat. §  134/72 ................................................................. 10

27 R.I. Gen. Laws § 29-1, *et seq.* ......................................................... 10

Ala. Code  § 27-45-3 .............................................................................. 10

Ark. Code Ann. §23-99-204 ................................................................... 10

Colo. Rev. Stat. § 10-16-122(1) ............................................................. 10

Conn. Gen. Stat. Ann. §38a-471 ............................................................ 10

Del. Code. Ann. tit. 18 § 7303 ............................................................... 10

Ga. Code Ann. § 26-4-144 .............................................................. 10, 25

Idaho Code Ann. § 41-3927 .................................................................. 10

Ind. Code § 27-8-11-3 ........................................................................... 10

Ky. Rev. Stat. Ann. § 304.17A-270 ....................................................... 10

La. Stat. Ann. § 22:1964 ........................................................................ 10

Mass. Gen. Laws ch. 176D, § 3B .......................................................... 10

Me. Stat. Ann. tit. 24, §4317 ................................................................. 10

Miss. Code Ann. § 83-9-6(3)(a) ............................................................. 10

Mont. Code Ann. § 33-22-111(1) ........................................................... 10

N.C. Gen. Stat. § § 58-51-37 ................................................................. 10

N.D. Cent. Code § 26.1-36-12.2 ............................................................ 10

N.H. Rev. Stat. Ann. § 420-B:12 ........................................................... 10

N.J. Rev. Stat. § 17:48-6j ....................................................................... 10

N.M. Code R. §§ 16.19.6.7 (F); 16.19.6.23(F) ..................................... 10

Neb. Rev. Stat. § 44-313 ....................................................................... 10

Okla. Stat. tit. 15, § 788(C) ................................................................... 10

S.C. Code Ann. § 38-71-147 ..................................................................................... 10

S.D. Codified Laws § 58-18-37 ............................................................................... 10

Tenn. Code Ann. § 56-7-2359 .................................................................................. 10

Utah Code Ann. § 31A-22-617 ................................................................................. 10

Va. Code Ann. § 38.2-3407.7 ................................................................................... 10

Wis. Stat. § 628.36(2)(b)........................................................................................... 10

Wyo. Stat. Ann. § 26-34-134 ................................................................................... 10

## **Other Authorities**

ABA Section of Antitrust Law, Antitrust Law Developments (7th Ed. 2012) ............................. 23

Plaintiff Park Irmat Drug Corp. ("Irmat") respectfully submits this memorandum of law in opposition to the motion to dismiss of Defendants Express Scripts Holding Company and Express Scripts, Inc. (together, "Express Scripts") (ECF No. 18).

## PRELIMINARY STATEMENT

This case concerns breaches of contract by, and the anticompetitive conduct of, Express Scripts.  Express Scripts is the largest pharmacy benefit manager ("PBM") in the U.S., administering a pharmacy network that covers the prescription drug purchases of 85 million Americans.  Express Scripts, like other large PBMs, is also the owner of a pharmacy that provides mail-order services to Express Scripts' members.  This infects Express Scripts with a conflict-of-interest: rather than use its heft to assure that members can access the best quality and lowest cost pharmacies, Express Scripts uses its PBM power to assure that no pharmacy but its own can supply mail-order services to its 85 million members.

This case concerns how Express Scripts acted on that conflict-of-interest by terminating plaintiff Irmat, a competitor in mail-order pharmacy services, from Express Scripts' pharmacy network.  Express Scripts did so not only to destroy Irmat as a competitor, but to further an anticompetitive scheme hatched by Express Scripts and other large PBMs to eliminate competition from independent mail-order pharmacies altogether.

Specifically, the case concerns "bait and switch" tactics that Express Scripts used to cripple Irmat.  There can be no dispute, as Exhibits 1 and 2 to Irmat's Complaint show, that in August 2015, Express Scripts "approved" Irmat "to continue in the Express Scripts Holding Company Pharmacy Networks" based upon a "review" of Irmat's "submitted credentials" – credentials that identified that 65% of prescriptions sold by Irmat were dispensed by mail order. There can also be no dispute that, despite this written promise, Express Scripts terminated Irmat

1

approximately nine months later.  This termination, which barred Irmat from serving almost 30% of U.S. customers, caused Irmat substantial financial harm, particularly as Irmat invested millions of dollars in its mail-order pharmacy operations to improve its quality in reliance on Express Scripts' August 2015 promise.  Consequently, to recover damages for the injuries that it has sustained as a result of these anticompetitive actions, Irmat brought this suit asserting claims under state contract and estoppel law, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) and state "Any Willing Provider" laws for which there are express private rights of action.

Now, Express Scripts moves to dismiss Irmat's well-pleaded Complaint, arguing that the claims asserted by Irmat do not even meet the minimal threshold of pleading plausibility.  This motion should be denied for the following reasons.

*First*, Express Scripts argues that Irmat's claim for breach of contract fails because, under a 2014 Network Provider Agreement ("NPA"), Express Scripts had the right to terminate Irmat "without cause."  But the NPA, which Express Scripts continues to insist only applied to "retail" pharmacy services, was novated, and thus substituted, when, in August 2015, Express Scripts "approved," in writing, Irmat's continuation as a provider in Express Scripts' networks notwithstanding Irmat's disclosed mail order sales.  That August 2015 writing fails to reference any "without cause" termination right, or any clause in the parties' prior NPA.

In fact, had the NPA's "without cause" termination right even applied following Express Scripts' August 2015 correspondence, which it did not, Express Scripts would have been precluded from terminating Irmat under the implied covenant of good faith and fair dealing inherent in every Missouri contract, as the termination of Irmat deprived Irmat of the expected benefit of its bargain.  Further, the NPA's one-sided "without cause" termination right is an unconscionable and unenforceable term contained within a contract of adhesion that Express

2

Scripts imposed on Irmat on a "take it or leave it" basis.  And, in the very least, Express Scripts'

August 2015 correspondence constitutes an extra-contractual promise – which Irmat relied upon

to its detriment – to allow Irmat to provide mail-order pharmacy services to Express Scripts

members.  Express Scripts is estopped from terminating Irmat on that basis.  Express Scripts'

contract and estoppel arguments should be rejected.

*Second*, Express Scripts argues that Irmat's antitrust claims should be dismissed.  For

example, Express Scripts argues that the Complaint does not set forth a plausible PBM

conspiracy and, as a result, the Section 1 claims asserted should be dismissed.  But that flies in

the face of several recent opinions of this Court that denied identical motions to dismiss Section

1 conspiracy claims brought against Express Scripts and its PBM co-conspirators by terminated,

independent pharmacies.  *See, e.g.*, *Precision Rx Compounding, LLC, et al. v. Express Scripts*

*Holding Company, et al.*, No. 4:16-cv-0069 (CEJ); *HM Compounding Services, LLC and HMX*

*Services, LLC v. Express Scripts, Inc.*, No. 4:14-cv-01858 (JAR); *Grasso Enterprises, LLC, d/b/a*

*Annie's Apothecary, et al. v. Express Scripts, Inc.*, No. 4:14-cv-1932 (HEA) (collectively, the

"Compounding Cases").  Express Scripts also contends that Irmat's Section 2 claims should be

dismissed because, according to Express Scripts, Irmat alleges implausible relevant markets, and

Express Scripts' "refusal to deal" with Irmat does not constitute actionable, exclusionary

conduct.  But those arguments contravene well-settled Supreme Court precedent on single brand

markets for distinct customers such as the "locked in" members of Express Scripts (*see Eastman*

*Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)), and unilateral terminations held to

be anticompetitive (*see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585

(1985)).  Express Scripts, in addition, argues that Irmat's so-called "negative tying" claim is not

cognizable.  But that too is belied by settled precedent, particularly cases holding that tying

3

arrangements that force entities to refrain from purchasing or supplying a good or service are anticompetitive.  The antitrust claims asserted are well-pleaded.

*Third*, Express Scripts half-heartedly seeks to dismiss claims brought by Irmat under Mississippi, North Carolina, and Georgia any willing provider ("AWP") laws.  Those laws expressly afford a private right of action to any pharmacies that have been excluded by a health plan or their agent PBM from a health plan network when that pharmacy would have agreed to the network's standard terms.  In light of the fact that Express Scripts permits its own pharmacy to provide mail-order pharmacy services in those states, Express Scripts' termination of Irmat for doing so violated those states' AWP laws.

Accordingly, for these reasons and those more fully set forth below, Express Scripts' motion to dismiss should be denied.

## STATEMENT OF FACTS

### A.    The Parties

Irmat is a New York pharmacy that opened in 1978.  Compl. ¶ 34.  In 2013, Irmat began focusing on dispensing dermatological drugs.  *Id.* ¶ 35.  Thereafter, Irmat began participating in pharmaceutical manufacturer patient assistance programs that provided Irmat with a nationwide customer base.  *Id.* ¶ 37.  As such, Irmat began providing mail-order pharmacy services to customers throughout the country.  *Id.*  Irmat's mail-order operation grew significantly due to high consumer demand for Irmat's quality services. *Id.* ¶ 38.

Express Scripts is the largest PBM in the U.S., with 85 million members.  *Id.* ¶ 17.  PBMs are third-party administrators responsible for processing and paying prescription drug claims made by pharmacies and patients.  *Id.* ¶ 28.  PBMs build networks of pharmacies through which PBM members can receive prescription medications at "covered," discounted rates.  *Id.* ¶

30.  For a pharmacy not owned by a PBM to operate successfully, it must participate in all of the largest PBM networks, including Express Scripts'.  *Id.*  Over 97% of all U.S. retail pharmacies participate in Express Scripts' pharmacy networks.  *Id.* ¶ 17.

Express Scripts also owns and operates a mail-order pharmacy – the only pharmacy that Express Scripts claims is permitted to mail prescriptions to Express Scripts' members.  *Id.* ¶ 18. Other PBMs also own and operate mail order pharmacies.  *Id.* ¶ 32.  Express Scripts' members have coverage for prescription medications only at Express Scripts network pharmacies.  Compl. ¶ 70.  The "out of pocket" costs for Express Scripts' members to fill prescriptions outside of the Express Scripts network are "substantially higher."  *Id.*  Most Express Scripts members are "locked into" using pharmacies in the Express Scripts network because the members' health plans, not the members themselves, chose to use Express Scripts as a PBM, and most health plan members have no effective choice but to use the health plans offered to them by their employer. Accordingly, the costs for Express Scripts members to switch PBMs are extremely high.  *Id.* ¶ 72.[1]  As a result, virtually no Express Scripts members have attempted to change PBM coverage because Express Scripts terminated their preferred pharmacy.  *Id.*

The PBM industry is highly concentrated.  Compl. ¶ 75.  PBMs manage 95% of all the drugs covered under group and individual health plans in the country.  *Id.*  Express Scripts, CVS Health, and the two other largest PBMs control approximately 80% of the PBM market.  *Id.* Express Scripts and CVS Health alone cover 65% of this market.  *Id.*

---

[1]  To do so, members would have to purchase a health insurance policy on the open market, despite that their employers may subsidize the cost of health insurance as part of their compensation.  *Id.*  Members would then have to choose a health plan based solely on the PBM that the health plan based chooses to use.  *Id.*

### B.      Irmat's Contractual Relationship with Express Scripts

On or about July 30, 2012, Irmat first gained access to Express Scripts' network through a contract with a pharmacy services administrative organization.  Compl. ¶ 40.  On or about October 28, 2014, Express Scripts sent Irmat a base Network Provider Agreement ("NPA").  *Id.* ¶ 41; Compl. Ex. 3.  The NPA was drafted entirely by Express Scripts, and Irmat was given no opportunity to negotiate any of its terms.  Compl. ¶ 41.  The letter accompanying the NPA stated that "Express Scripts requires every pharmacy in the Express Scripts network(s) to have a signed base provider agreement on file."  *Id.* ¶ 41; Compl. Ex. 3 at 1.  The letter also stated that "**[i]f your pharmacy fails to complete and return the required [NPA] your pharmacy may receive a breach notification**," and experience "patient disruption."  Compl. ¶ 41; Compl. Ex. 3 at 1 (emphasis in original).  On or about October 29, 2014, Irmat executed the NPA and provided it to Express Scripts.  Compl. ¶ 43.

In July 2015, Express Scripts demanded that Irmat submit a re-credentialing application. Compl. ¶ 44.  In the application, *Irmat accurately disclosed that 65 percent of Irmat's business was "Mail Order."*  Compl. ¶ 44; Compl. Ex. 1 at 5.  On August 7, 2015, ESI sent Irmat an email stating "***your recently submitted credentials have been reviewed and you are approved to continue in the Express Scripts Holding Company pharmacy networks.***"  Compl. ¶ 45; Compl. Ex. 2 (emphasis added).  In reliance upon this assurance, Irmat made substantial investments in its mail-order business.  Compl. ¶ 46.  Irmat hired scores of employees, constructed a multi-million dollar facility, and obtained the most exacting industry accreditations.  *Id.*

By letter dated July 15, 2016, Express Scripts notified Irmat that Express Scripts was terminating Irmat from its pharmacy networks in September 2016.  Compl. ¶ 51.  The ostensible basis for termination was that, due to Irmat's mail-order business, Irmat failed to meet the

6

definition of a "retail provider" under the NPA.  *Id.*  Irmat appealed its termination through

Express Scripts' internal appeals process.  *Id.* ¶ 52.  By letter dated August 22, 2016, Express

Scripts nonetheless informed Irmat that it had affirmed its termination decision.  *Id.* ¶ 53.  In this

letter, for the first time, it stated that Irmat was also being terminated "without cause."

### C.      Express Scripts and Co-Conspirator PBMs Conspired to Suppress Competition from Irmat and Other Independent Mail-Order Pharmacies.

Express Scripts and other large PBMs, including CVS Health, have agreed to exclude

competing independent mail-order pharmacies from these PBMs' respective pharmacy networks.

*Id.* ¶ 2.  These PBMs have used a trade association that they control, the Pharmaceutical Care

Management Association ("PMCA"), as a conduit to conspire.  Compl. ¶ 83.[2]  In implementing

their conspiracy, each of the co-conspirator PBMs drew from the same playbook of tactics,

which included:

- terminating Irmat and other independent pharmacies (*id.* ¶ 88(a));

- forcing independent pharmacies to sign contracts of adhesion that purport to prohibit pharmacies from providing mail-order pharmacy services to members (*id.* ¶ 88(b));

- undertaking pharmacy audits in order to establish pretextual bases for termination (*id.* ¶ 88(d)); and

- informing members that they were not covered at certain independent mail-order pharmacies even when those pharmacies had not been terminated from the PBM's network (*id.* ¶ 88(f)).

Other independent pharmacies that have been terminated by Express Scripts and its co-

conspirators have filed antitrust and breach of contract suits in this District.  Compl. ¶ 89.  *See*

the Compounding Cases.  The Compounding Cases have proceeded to discovery after motions to

dismiss were denied.  *Id.*

---

[2]   Executives from Express Scripts and its co-conspirators serve on the PCMA's board of directors.  *Id.* ¶ 84.  PCMA statements make clear that the PCMA facilitates communication and collaboration among PBMs.  *Id.* ¶ 85.

# ARGUMENT

## I.    Relevant Standards

To survive dismissal, a complaint must merely include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding that there are "no heightened pleading standards" relevant to antitrust claims).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the] facts [alleged] is improbable." *Id*. at 556 (citation omitted).  In considering a motion to dismiss, "the Court must assume all the facts alleged in the complaint are true, and liberally construe the complaint in the light most favorable to the plaintiff." *HM Compounding Servs., Inc. v. Express Scripts, Inc*., 2015 U.S. Dist. LEXIS 89062, at *6 (E.D. Mo. July 9, 2015).

## II.    Irmat's Breach of Contract Claim Satisfies Relevant Pleading Standards.

### A.    Express Scripts Breached the Parties' Novated Agreement.

The Complaint sets forth a claim that Express Scripts breached the parties' novated agreement.  "A novation is a substitution of a new contract obligation for an old one." *Health Related Servs., Inc. v. Golden Plains Convalescent Ctr., Inc.*, 705 S.W.2d 499, 510 (Mo. Ct. App. 1985).  "The controlling element in determining whether a novation has been accomplished is the intention of the parties." *W. Crawford Smith, Inc. v. Watkins*, 425 S.W.2d 276, 279 (Mo. Ct. App. 1968).  "[T]he assent for novation and acceptance of a new obligation. . . may be shown from the attendant circumstances and the conduct of the parties thereafter." *Health Related Servs.*, 705 S.W.2d at 510; *see also Wolfson v. Balt. Bank of Kan. City*, 157 S.W.2d 560, 565 (Mo. Ct. App. 1942).  "Whether it was the intention of the parties to effect a novation is ordinarily a question for the jury . . ." *Watkins*, 425 S.W.2d at 279 .

8

Here, the Complaint alleges much more than merely "plausible" facts demonstrating that the parties intended to novate the NPA to allow Irmat to participate as a mail-order pharmacy in Express Scripts' network.  The complaint points to explicit writings that show that the NPA was novated in this regard.  Indeed, Express Scripts now claims that the NPA covered only "retail" (*i.e.*, face-to-face) pharmacy services.  *See* Def. Mem. at 1, 3-5.  In its re-credentialing application, however, Irmat accurately disclosed that mail-order dispensation constituted 65% of its sales in response to Express Scripts' specific inquiry.  Compl. ¶ 44.  Thereafter, Express Scripts wrote to Irmat that "*your recently submitted credentials have been reviewed and you are approved to continue in the Express Scripts Holding Company pharmacy networks.*"  Compl. ¶ 45; Compl. Ex. 2 (emphasis added).  These facts show that the NPA was novated to permit Irmat to provide mail-order pharmacy sales to Express Scripts' members.[3]  And they render Express Scripts' termination of Irmat a breach.

Critically, nothing in the novated agreement gave Express Scripts an unfettered right to terminate Irmat.  The terms of the novation are governed by the intent that the parties had when entering into the novation -- a factual issue that cannot be resolved at the pleading stage.  If anything, the facts show that in agreeing to the novation, Irmat had a reasonable expectation that it could not be terminated without cause by Express Scripts.  Irmat invested millions of dollars to expand its facilities and customer service capabilities, and obtain rigorous industry accreditations *following* Express Scripts' representation that Irmat could continue to mail prescriptions to

---

[3]  Express Scripts makes the meritless argument that the parties' novation was not supported by consideration.  Def. Mem. at 10-11.  Just as Irmat's promise to provide "retail" pharmacy services to all Express Scripts members under the NPA (*see* Compl. Ex. 3 § 2.6) was consideration for that agreement, Irmat's promise to provide mail-order pharmacy services to all Express Scripts members was consideration for the novated agreement.

Express Scripts' members.[4]  No rational pharmacy would have made those investments if it believed it could be terminated on a whim by a PBM that covers such a large portion of the pharmacy's customer base.  Indeed, the reasonableness of Irmat's state-of-mind, post-novation, is confirmed by the dozens of AWP laws that prohibit at-will terminations of pharmacies from pharmacy networks.  These laws prevented Express Scripts from terminating without cause (even if the NPA was not novated).[5]  Irmat dispensed to all of the states that have AWP laws.[6]

Express Scripts tries to brush off its August 7, 2015 communication as merely a "template two-line email" (Def. Mem. at 10) with no legal significance.  But if that email had no significance, then why did Express Scripts send it?  And, if the novated agreement permitted

---

[4]  Defendant Express Scripts Holding Company claims that it "was not a party to the Agreement that gives rise to this Action."  Def. Mem. at 3.  However, the novated agreement expressly states that Irmat was approved to participate in the "Express Scripts Holding Company pharmacy networks."  Compl. Ex. 2.  Express Scripts Holding Company was a party to the novated agreement.

[5]  *See, e.g.,* Ala. Code  § 27-45-3; Ark. Code Ann. §23-99-204; Colo. Rev. Stat. § 10-16-122(1); Conn. Gen. Stat. Ann. §38a-471; Del. Code. Ann. tit. 18 § 7303; Ga. Code Ann. § 26-4-144;  Idaho Code Ann. § 41-3927; 215 Ill. Comp. Stat. §  134/72; Ind. Code § 27-8-11-3; Ky. Rev. Stat. Ann. § 304.17A-270;  La. Stat. Ann. § 22:1964; Me. Stat. Ann. tit. 24, §4317; Mass. Gen. Laws ch. 176D, § 3B; Miss. Code Ann. § 83-9-6(3)(a); Mont. Code Ann. § 33-22-111(1); Neb. Rev. Stat. § 44-313; N.M. Code R. §§ 16.19.6.7 (F); 16.19.6.23(F); N.H. Rev. Stat. Ann. § 420-B:12; N.J. Rev. Stat. § 17:48-6j; N.C. Gen. Stat. § § 58-51-37; N.D. Cent. Code § 26.1-36-12.2;  Okla. Stat. tit. 15, § 788(C); 27 R.I. Gen. Laws § 29-1, *et seq.*; S.C. Code Ann. § 38-71-147; S.D. Codified Laws § 58-18-37; Tenn. Code Ann. § 56-7-2359; Utah Code Ann. § 31A-22-617; Va. Code Ann. § 38.2-3407.7; Wis. Stat. § 628.36(2)(b); Wyo. Stat. Ann. § 26-34-134.

[6]  Express Scripts argues that it did not waive its right to terminate the NPA.  Def. Mem. at 8-9.  This is a straw man argument.  The Complaint does not allege waiver.

10

Express Scripts to terminate Irmat without cause, then why did it not reference such terms or the NPA at all?[7]  These are factual questions that cannot be resolved on this motion.[8]

**B.     Express Scripts Breached the Covenant of Good Faith and Fair Dealing.**

Even if the parties did not agree to novate the NPA, Express Scripts' termination violated the duty of good faith and fair dealing implied in the performance and enforcement of every contract.  *HM Compounding Servs., LLC*, 2017 U.S. Dist. LEXIS 73956, at *5-6 (E.D. Mo. May 16, 2017).  "This good faith requirement extends to the manner in which a party employs discretion conferred by a contract." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007).  A violation of the covenant of good faith and fair dealing exists where a party "exercise[s] its discretion [under a contract] in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *Id* (quotation marks omitted)*; see also Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo. Ct. App. 1986).  Recently, Judge Ross, in denying Express Scripts, Inc.'s motion to reconsider his refusal to grant summary judgment on a pharmacy's breach of contract claim, held that the implied duty of good faith and fair dealing applied to Express Scripts' termination of its pharmacy provider agreements.  *See HM Compounding*, 2017 U.S. Dist. LEXIS 73956, at *5-6.

---

[7]   This case is thus distinguishable from *State ex rel. Premier Mktg. v. Kramer*, 2 S.W.3d 118 (Mo. Ct. App. 1999), and *National Surety Corp. v. Prairieland Construction, Inc.*, 354 F. Supp. 2d 1032 (E.D. Mo. 2004), both cited by Express Scripts.  In *Kramer*, the purported novation explicitly referenced terms of the parties' prior agreement.  2 S.W.3d. at 122.  In *Prairieland*, the purported novation released "future obligations" and "unambiguously stated" that past obligations remained unchanged.  354 F. Supp. 2d at 1038.

[8]   Express Scripts asserts that the novation claim in *Boswell v. Panera Bread Co.*, No. 4:14-cv-01833-AGF, 2016 U.S. Dist. LEXIS 38232 (E.D. Mo. Mar. 24, 2016), is "similar" to Irmat's.  Def. Mem.at 10.  This is wrong.  In *Boswell*, a summary judgment opinion decided on a factual record, the court held that the defendant had failed to prove its theory that plaintiffs had agreed to a novation of an employment compensation plan through "implied assent."  *Id.* at *16.  Here, there is no argument that Express Scripts' assent to novate the NPA was merely "implied."  Express Scripts' intent was conveyed to Irmat in a written communication.

Express Scripts explicitly approved Irmat's continued participation in the Express Scripts pharmacy networks, with full knowledge of Irmat's mail-order operations, without any reference to the NPA or a unilateral "at-will" termination right.[9]  In light of this written approval, Irmat operated and grew its business with the reasonable expectation that it would not be arbitrarily terminated by Express Scripts.  Further, as the Complaint alleges, Express Scripts' termination was carried out with a bad faith purpose: to further the PBM conspiracy to eliminate significant competitors from providing mail-order pharmacy services.  The Court should thus deny Express Scripts' motion to dismiss Irmat's claim for breach of the covenant of good faith.[10]

### C.    The NPA's One-Sided At-Will Termination Provision Is Unconscionable.

The Court should deny Express Scripts' motion to dismiss for the additional reason that the NPA's one-sided at-will termination provision is unconscionable.  Missouri's unconscionability doctrine "guard[s] against one-sided contracts, oppression and unfair surprise."  *Brewer v. Mo. Title Loans*, 364 S.W.3d 486, 492-93 (Mo. 2012).  "Oppression and unfair surprise can occur during the bargaining process or may become evident later, when a dispute . . . invoke[s] the objectively unreasonable terms."  *Id.* at 493.  Missouri courts look to the facts surrounding the formation of a contract to determine unconscionability (*id.* at 492 n.3), and consider factors such as whether one of the parties exerted high pressure during negotiations or had significantly unequal bargaining power, whether the contract was non-negotiable, and whether the terms were extremely one-sided.  *See id.* at 493; *Fuller v. TLC Prop. Mgmt., LLC*,

---

[9]   Express Scripts argues that it gave Irmat "multiple opportunities to cure its breach, beginning with a cease-and-desist letter on May 18, 2016."  Def. Mem. at 6-7.  Had Irmat discontinued its mail service then it would have lost millions of dollars that it invested in its business as a result of Express Scripts' August 7, 2015 correspondence.

[10]   Moreover, *Margolies v. McCleary, Inc.*, 447 F.3d 1115 (8th Cir. 2006), relied on by Express Scripts, notes that "a claim of breach of a duty of good faith and fair dealing is not fundamentally inconsistent with or duplicative of a breach of contract claim."  *Id.* at 1125.

402 S.W.3d 101, 109 (Mo. Ct. App. 2013) (concurring opinion).  Unconscionability is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss.  *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998) (holding that "the question whether a transaction is 'unconscionable' is . . . normally not clear enough to be decided as a matter of law"); *Tockstein v. Spoeneman*, No. 4:07cv00020-ERW, 2009 U.S. Dist. LEXIS 60024, at *5 (E.D. Mo. July 14, 2009).

The Complaint alleges ample facts demonstrating that the NPA's at-will termination provision is unconscionable.  Express Scripts had tremendous leverage over Irmat: Express Scripts is the largest PBM in the U.S., with 85 million members.  Indeed, participating in Express Scripts' network is a matter of business necessity for 97 % of U.S. pharmacies.  Compl. ¶¶ 17, 31.  Moreover, the NPA was a non-negotiable form contract.  *Id.* ¶ 42.  The cover letter to Irmat enclosing the NPA confirms this, stating "**[i]f your pharmacy fails to complete and return the required [NPA], your pharmacy may receive a breach notification**."  Compl. Ex. 3 at 1 (emphasis in original).  It also states that "[t]his will be your pharmacy's last opportunity to  . . . return the provider agreement . . . ."  *Id.*  Express Scripts' presentation of the NPA on this "take it or leave it basis" strongly supports that the agreement is unconscionable.  *See Woods v. QC Fin. Servs.*, 280 S.W.3d 90, 97 (Mo. Ct. App. 2008).

Further, the one-sided nature of the at-will termination provision demonstrates unconscionability.  The NPA states that only Express Scripts may terminate without cause (*See* Compl. Ex. 3 § 4.2(a)).  Such one-sided provisions have been held to be unconscionable under Missouri law.  *See, e.g., Brewer*, 364 S.W.3d at 494 (arbitration provision unconscionable where

13

arbitration provision was one-sided).[11]  Accordingly, the NPA's "without cause" termination

clause would be unenforceable even if it was relevant following the parties' novation.[12]

## III.  The Complaint Sufficiently Pleads an Estoppel Claim.

Express Scripts asserts that Irmat's equitable estoppel claim should be dismissed because

equitable estoppel is a defense under Missouri law, not an affirmative claim.  Def. Mem. at 12.

Express Scripts' arguments fail.

The Complaint pleads facts sufficient to allege a claim for "promissory" estoppel, rather

than the Missouri state law defense of "equitable" estoppel, regardless of the label applied to the

claim.  The elements of a promissory estoppel claim are: 1) a promise; 2) on which a party relies

to his or her detriment; 3) in a way the promisor expected or should have expected; and 4)

resulting in an injustice that only enforcement of the promise could cure.  *Butano v. Fargo*, No.

4:13-CV-1652(HEA), 2014 U.S. Dist. LEXIS 93708, at *10 (E.D. Mo. July 10, 2014).  The

Complaint pleads specific facts stating such a claim.  The August 7 email constituted a promise

by Express Scripts that it would permit Irmat to participate in Express Scripts' pharmacy

networks as a mail-order pharmacy.  And, Irmat, in reliance on this promise, invested heavily to

---

[11]  Express Scripts asserts that "unilateral termination-without-cause provisions should be enforced as
written." Def. Mem. at 7.  But the cases Express Scripts cites provide either for bilateral without-cause termination
provisions, *see Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 521-22 (Mo. 1988) ("This Agreement may be
terminated at any time by either party . . ."); *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 879 (Mo. Ct. App.
2012) ("Either party may terminate this Agreement with or without cause . . . ."), or heavily restricted cancellation
rights (*see Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 37 (8th Cir. 1975).  Further, none of these cases
involved unconscionable contracts of adhesion.

[12]  Express Scripts cites to three cases between CVS Health (or related entities) and pharmacies where
courts have held that the provider agreement was not an unenforceable contract of adhesion.  All are inapposite.
Two were decided under Arizona unconscionability law.  *See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
748 F.3d 249, 263-64 (5th Cir. 2014) and *Hopkinton Drug, Inc. v. CaremarkPCS, L.L.C.*, 77 F. Supp. 3d 237, 245
(D. Mass. 2015).  Further, *Crawford* was decided based on plaintiff's failure to "suppl[y] record evidence," not on
the pleadings.  748 F.3d at 264-65.  *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172 (N.D. Cal.
2013), a case under California law, was also decided on an evidentiary record, not on the pleadings.

grow its mail-order business, as Express Scripts should have expected.  This has resulted in substantial injustice to Irmat.

Express Scripts does not assert that Irmat has insufficiently pled the basic elements of promissory estoppel.  Rather, it claims that estoppel is unavailable here because the NPA "unambiguously sets forth the bases on which it may be terminated."  Def. Mem. at 13.[13]  But Express Scripts' argument is undermined by their position that the August 7 email has no bearing on the parties' rights under contract law.  Express Scripts cannot have it both ways.  If the August 7 email did not novate the NPA and thus create an entirely new contract, then it was an extra-contractual promise that allowed Irmat to provide mail-order services to Express Scripts' members.  Irmat's estoppel claims should proceed.

## IV.    Irmat's Antitrust Claims Satisfy Relevant Pleading Standards.

### A.    Express Scripts has Participated in an Antitrust Conspiracy that Violates Section 1.

Express Scripts moves to dismiss Irmat's Section 1 claim, arguing that Irmat failed to allege a plausible conspiracy.  For the same reasons that Judges Ross, Jackson, and Autrey allowed Section 1 conspiracy claims in the Compounding Cases to proceed, Express Scripts' motion should be denied.

"[T]he typical conspiracy is rarely evidence[d] by explicit agreements, but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators."  *Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 U.S. Dist. LEXIS 9998, at *7 (E.D. Mo. Jan. 25, 2017) (quotation marks omitted).  "It is possible to infer the existence of an

---

[13]    Express Scripts' reliance on *Saey v. Xerox Corp.*, 31 F. Supp. 2d 692 (E.D. Mo. 1998) is misplaced.  In that case, the purported extra-contractual promise was made *prior* to the parties entering into a contract that provided it "supersede[s] all previous agreements . . . ."  *Id.* at 695.  Here, the August 7 email was sent *after* the parties entered into the NPA.

agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence – often referred to as the plus factors." *Precision Rx Compounding*, 2016 U.S. Dist. LEXIS 112851, at *7 (E.D. Mo. Aug. 24, 2016) (quotation marks omitted).

The Complaint alleges plus factors, in combination with PBM parallel conduct, to support Irmat's conspiracy to boycott claims.  In fact, the Complaint alleges many of the same plus factors successfully pleaded in the Compounding Cases.  For example, it alleges that the PBM conspirators joined in approximately 2014 through the PCMA, their trade association, to collectively determine how best to eliminate independent mail-order pharmacies.  Compl. ¶ 87; *see supra* SOF Part C.  In the Compounding Cases, the courts held that the PBM conspirators' control of and participation in the PCMA constituted a plus-factor supporting conspiracy.[14]  The Complaint also alleges that the PBM market is highly concentrated  (Compl. ¶¶ 18-20, 75, 94(e); *see supra* SOF part A), another successfully-alleged plus factor in the Compounding Cases.[15]

The Complaint's allegations regarding the timing of, and similarity between, the PBM conspirators' actions to foreclose Irmat and other independent mail-order pharmacies also support a conspiracy inference.  The Complaint alleges that, since 2014, the PBM conspirators engaged in abusive audits of competitor pharmacies, terminations of them, and unconscionable

---

[14]   *See HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *13 ("Membership and participation in a trade group facilitates collusion."); *Precision Rx*, 2016 U.S. Dist. LEXIS 112851, at *9-10 (Membership and participation in a trade group "provides opportunities to conspire."); *Grasso*, 2017 U.S. Dist. LEXIS 9998, at *9-11 (citing *HM Compounding*); *see also Evergreen Partnering Grp. Inc. v. Pactiv Corp.*, 720 F.3d 33, 49 (1st Cir. 2013) (Exchanges through common membership in a business group "may serve as practices facilitating collusion . . ."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.) (affirming denial of motion to dismiss)

[15]   *See HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *13-14 ("The highly concentrated nature of the PBM industry also supports an inference of conspiracy."); *Precision Rx*, 2016 U.S. Dist. LEXIS 112851, at *10-12 (same); *Grasso*, 2017 U.S. Dist. LEXIS 9998, at *11-12 (same); *see also Evergreen Partnering Grp. Inc.*, 720 F.3d at 48 (allegation that five defendants controlled 90 percent of the market supports a plausible conspiracy); *In re Text Messaging*, 630 F.3d at 628; *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323-24 (2d Cir. 2010) (allegation that "defendants control over 80%" of the market supported inference of conspiracy).

contracting practices.  *See supra* SOF Part C.  Substantially similar allegations were found to be sufficient plus-factors in the Compounding Cases.[16]

In its bid to dismiss Irmat's conspiracy claims, Express Scripts does not address the allegations of (1) market consolidation and concentration; (2) the PBM co-conspirators' common motive to enter, or further their interests in, the market for mail-order pharmacy services; and (3) the pretextual and misleading reasons for the PBM co-conspirators' conduct.  Rather, it merely asserts that Irmat fails to allege specific communications, specific meetings at which the conspiracy was hatched, or specific employees that attended such meetings.  Def. Mem. at 14.  This level of specificity is not required to plead conspiracy.  *See, e.g., Starr*, 592 F.3d at 325 ("[P]laintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation.");  *HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *8.[17]  Express Scripts also cites to a series of cases that stand for the unremarkable proposition that mere participation in trade association meetings – *without more* – does not establish a Section 1 conspiracy: here, the Complaint alleges that the PBM co-conspirators *controlled* the relevant trade association, not just that they attended meetings.[18]

---

[16]  *See HM Compounding*, 2015 U.S. Dist. LEXIS 89062, at *14-17; *Precision Rx*, 2016 U.S. Dist. LEXIS 112851, at *13 (holding that co-conspirators' use of "similar tactics . . . to implement the conspiracy's goal of eliminating plaintiffs and other independent compounding pharmacies from the market" is indicative of a conspiracy); *Grasso*, 2017 U.S. Dist. LEXIS 9998, at *13-14.

[17]  Express Scripts' reliance on *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) is misplaced.  In that case, there was a simple conclusory allegation that banks had conspired to set default interchange fees for payment cards.  There were no plus factors allege to support this conclusory statement.

[18]  For example, in *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186, 1196 (9th Cir. 2015), unlike here, the conspiring defendants were not alleged to control the trade association, but merely attended large meetings where certain positions were advocated by the trade association.  Likewise, in *In re Travel Agent Commission Antitrust Litigation*, 583 F.3d 896 (6th Cir. 2009), plaintiffs alleged that defendants attended some industry association meetings, but there was no allegation that defendants controlled these associations, and the complaint pled no other plus-factors that are alleged here.

Express Scripts also attempts to escape Section 1 scrutiny by providing a "non-conspiratorial explanation for Express Scripts' decision to terminate" Irmat, claiming that it only terminated Irmat after what Express Scripts says was Irmat's "clear breach" of the NPA.  Def. Mem. at 16.  This alternative explanation is irrelevant to this pleadings motion, as it is *contrary* to the Complaint's allegations that identify that Express Scripts had an anticompetitive and bad faith motive.

Express Scripts also wrongly claims that "the allegations regarding CVS Health . . . and Express Scripts contain too many significant differences []to be considered 'parallel.'"  Def. Mem. at 16.  In fact, the Complaint alleges that CVS Health terminated Irmat on January 20, 2017, less than five months after Express Scripts terminated Irmat, for the same anticompetitive purpose effectuated by Express Scripts.  Compl. ¶¶ 91-92.  Express Scripts would have this Court conclude that, *as a matter of law*, Express Scripts' and CVS Health's decisions to terminate Irmat in this less than five-month span were coincidental, and the product of independent self-interest.  Such a factual determination cannot be made at the pleading stage.

### B.     Express Scripts Has Engaged in Illegal Acts That Violate Section 2

### 1.     The Complaint Pleads Plausible Relevant Product Markets.[19]

The Complaint specifically alleges two product markets: the (1) market for mail-order pharmacy services and (2) sub-market for mail-order pharmacy services to Express Scripts members.  Compl. ¶¶ 67-72.  Express Scripts challenges the sub-market alleged, claiming that it is implausible because it "omit[s] all other pharmacy mail-order pharmacy services, whether offered independently or through competing PBMs, to which third-party payers and *their members could turn*."  Def. Mem. at 19 (emphasis added).  This conclusory statement simply

---

[19]   Express Scripts does not dispute that the geographic markets asserted are plausible.

contravenes the detailed allegations stating that members of Express Scripts cannot turn to competing pharmacies, in light of the PBM conspiracy to monopolize mail-order pharmacy sales to their captured memberships by exercising their PBM power to exclude.  Compl.  ¶ 3 ("Express Scripts and its co-conspirators hatched and furthered their plans to foreclose competition from mail-order pharmacies that dared to compete with those owned by PBMs.")  And it is contrary to Express Scripts' own admission that it operates the only sanctioned mail-order pharmacy that it permits Express Scripts' members to utilize.  See Def. Mem. at 3 and 16.

To be sure, the Complaint alleges that there are no mail-order pharmacies to which Express Scripts' members "could turn" other than those in Express Scripts' networks.  It states that there are no "economic substitutes for prescriptions drugs dispensed by mail-order pharmacies that are part of the Express Scripts network for Express Scripts members."  Compl. ¶ 70 (explaining that it is "much more expensive for the vast majority of Express Scripts members to obtain prescription drugs from pharmacies outside of Express Scripts' networks . . .")

Moreover, the Complaint identifies that Express Scripts members would likely not switch PBMs in order to have their drug purchases covered outside of the PBM network, as they are "'locked into' using pharmacies in the Express Scripts network for the dispensation of their prescribed medications."  Compl. ¶¶ 71, 72, 112.  And, the Complaint details why Express Scripts members are locked into the Express Scripts network, including 1) that member health insurance plans "[choose] to use Express Scripts as a PBM," and 2) decisions regarding which health insurance plan to offer are generally "made by [] employer[s] in which members have no say."  Compl. ¶ 71.  Further substantiating the lock in effect described are allegations stating that "[t]he costs for Express Scripts members to switch PBMs are extremely high."  *See* SOF at A.  In

light of this lock in effect, "virtually no Express Scripts members attempt to change PBMs when Express Scripts . . .  terminate[s] a pharmacy. . . ."  *See* Compl. ¶ 72.[20]

These detailed allegations of a "sub-market for pharmacy services to Express Scripts members" sets forth a plausible "single brand" relevant market.  In *Eastman Kodak Co.*, 504 U.S. 451, the Supreme Court rejected defendant Kodak's "content[ion] that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act."  *Id.* at 481.  Rather, holding that Kodak service and parts were "not interchangeable with other manufacturers' service and parts," the Court held that the market from "the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines."  *Id.* at 482.  Here, as Express Scripts members are locked into the Express Scripts PBM, due to high switching costs and the PBM choice made by the health plan offered to them by their employer, the single brand Express Scripts market allegations made by Irmat are much more than simply plausible under *Kodak* and its progeny.[21]

The cases relied upon by Express Scripts to support its market definition arguments are inapposite.  *Double D Spotting Serv. v. SuperValu, Inc*., 136 F.3d 554, 560-61 (8th Cir. 1998) concerned a case where the plaintiff attempted to circumscribe the relevant geographic market to a single warehouse in Des Moines: here, plaintiff has asserted a nationwide geographic market.

---

[20]   These detailed "lock in effect" allegations demonstrate that the dismissal decision in *Prime Aid Pharmacy Corp. v. Humana Inc*., No. 16-cv-2104, slip op. (D.N.J. Mar. 2, 2017) (ECF No. 30), upon which Express Scripts relies, is inapposite.  The Complaint in *Prime Aid* failed to "plausibly allege that Humana's insureds are unable to switch plans that offer interchangeable services" (Def. Mem. at 19).  Notably, the *Prime Aid* court dismissed without prejudice.  The plaintiff in that case has filed a new Complaint detailing its lock in allegations.  *See Prime Aid Pharmacy Corp. v. Humana Inc.*, 16-cv-2104, D.N.J., ECF No. 32.

[21]   *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 277 (6th Cir. 2015) (affirming grant of preliminary injunction in single brand market case where switching costs were high); *Newcal Indus. v. IKON Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) (reversing Rule 12(b)(6) dismissal in single brand market case); *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc*., 2015 U.S. Dist. LEXIS 168581, *40 (M.D. Fla. Nov. 4, 2015) (denying motion to dismiss concerning alleged single brand contact lens markets because "a retailer cannot substitute for the prescribed brand and type of contact lens").

*Little Rock Cardiology Clinic, PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009) and *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 514 (3d Cir. 1998) concern alleged medical markets for private insurance, not markets for pharmacy services to which PBMs members are locked in due to **choices made by PBMs** that members cannot and do not select.

Moreover, none of these cases concern single brand markets that result from actions taken by a supplier to lock-in market participants.   In that respect, this case is much more akin to *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 562 F. Supp. 2d 392, 403-04 (E.D.N.Y. 2008) than any of the cases that Express Scripts referenced.  In *Interchange Fee*, the court denied defendant MasterCard's motion to dismiss a monopolization case based on an alleged "single brand" market for network services for MasterCard transactions that existed separate from other payment forms.  The court held that this single brand market was plausible because MasterCard prevented banks that issued their cards and merchants that accepted them from using network services other than those supplied by MasterCard when a MasterCard card was presented at the point of sale. The single brand market was appropriate in that case, notwithstanding the broader market for payment services that existed, because "circumstances prevent[ed] consumers from substituting alternatives . . ."  *Id.* at 403.  Here, the structure of PBM markets and actions of the PBMs, like those actions of MasterCard, similarly prevented Express Scripts members from switching – either to becoming members of competing PBM networks or to being customers of independent mail-order pharmacies.

The sub-market for mail-order pharmacy services to Express Scripts customers is also supported by *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), which held that submarkets can be defined by "practical indicia," including by "distinct customers." As the Eighth Circuit has held, "[t]he existence of competition between two product lines does not alone

preclude market power within each line, if each product has a cadre of customers in which it enjoys a decisive advantage." *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 n.5 (8th Cir. 1981). *Accord*, *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ("a core group of particularly dedicated, distinct customers, . . . may constitute a recognizable submarket . . . because their particular circumstances dictate that a product is the only realistic choice . . .") (quotations omitted) (quoting *Brown Shoe* and *Super Turf*). The Complaint alleges that Express Scripts members constitute distinct consumers that make up a relevant sub-market. Those allegations show that Express Scripts forces its members (not other PBM members) to use its mail-order pharmacy. And they show that the Express Scripts pharmacy has agreed not to solicit members of other PBM networks for mail order sales: if members of other PBM networks were substitutable for Express Scripts members than Express Scripts, as a rational economic actor, should seek to service those customers, but it does not. Compl. ¶ 33 (noting PBM conspiracy to "terminate from their respective pharmacy networks all pharmacies [including PBM-owned pharmacies] that constitute a significant competitive threat. . .").

In any event, this Court should reject Express Scripts' market definition arguments, as market definition is a quintessential issue of fact reserved for the jury. *Wholesale Grocery Prods. Antitrust Litig. v. DeLuca's Mkt. Corp.*, 752 F.3d 728, 735 (8th Cir. 2014) ("relevant product market is a question of fact") (quotation omitted).[22]

### 2.   The Complaint Identifies Express Scripts' Anticompetitive Conduct.

Relying on *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004), Express Scripts also argues that its "refusal to deal" with Irmat is not anticompetitive

---

[22]   *See also Kodak*, 504 U.S. at 481 ("market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers"); *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.) ("[M]arket definition is a deeply fact-intensive inquiry"); *HM Compounding*, 2015 U.S. Dist. LEXIS 89062 at *19.

conduct that violates Sherman Act § 2.  *Trinko* concerned a scenario where regional Bell company monopolies refused to interconnect with entities that needed their infrastructure to offer competing local service.  In that case, "[t]he complaint [did] not allege that Verizon voluntarily engaged in a course of dealing with its rivals . . ," prior to its refusals to deal.  *Id*. at 409.  To the contrary, the Complaint here identifies that Express Scripts voluntarily entered into a deal with Irmat that allowed it to serve Express Scripts' members, including by mail order services.

Accordingly, this case is much more akin to *Aspen Skiing Co.*, 472 U.S. 585 than *Trinko*.  In *Aspen Skiing*, the Court recognized that a decision to "terminate [a] marketing arrangement" constituted exclusionary conduct under Section 2 because it amounted to a "decision by [the] monopolist to make an important change in the character of the market." *Id*. at 604.  *See* ABA Section of Antitrust Law, Antitrust Law Developments (7th Ed. 2012) at 261; *Trinko* at 409.  Here, like in *Aspen Ski*, Express Scripts' refusal to deal did constitute a change in the market's character: it wrongly ended a pre-existing relationship.

C.     **Express Scripts Has Engaged in *Per Se* Illegal Tying.**

The Complaint alleges that Express Scripts exercised its power as a PBM by forcing pharmacies to refrain from providing competitive mail order services to Express Scripts members as a condition for entry into the Express Scripts retail pharmacy network.  That constitutes a classic, tying arrangement that offends Section 1 *per se*.  *See N. Pac. Ry Co. v. United States*, 356 U.S. 1, 5-6 (1958) ("an agreement . . . to sell [a] product [] only on the condition that the buyer . . . not purchase that product from any other supplier" can violate Section 1).

Express Scripts argues that Irmat's tying claim fails because it sets forth a "negative tie" that is not cognizable under the law.  That is simply wrong.  Def. Mem. at 21.  See *Kodak*, 504

23

U.S. at 463 (reversing summary judgment for defendant on tying claim and holding that "[t]he record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's.") (emphasis added). *See also Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912, n.22 (9th Cir. 2008) ("A § 1 violation can also occur when the customer promises not to take the tied product from the defendant's competitor . . .").[23]

Express Scripts also argues that Irmat did not allege that Express Scripts wields market power in a market relevant to the tying claim asserted. Def. Mem. at 22. That is meritless. The Complaint is rife with allegations that demonstrate that Express Scripts, as a PBM, wields massive market power over pharmacies. To support its market power contentions, the Complaint points to direct evidence demonstrating that seller has the power to raise prices, or impose other burdensome terms such as a tie-in. *See Fortner Enters. v. U.S. Steel Corp*., 394 U.S. 495, 504 (1969); *United States v. Visa U.S.A*., *Inc*., 344 F.3d 229, 239 (2d Cir. 2003) (affirming Section 1 verdict against defendants); Compl. ¶ 78 ("Express Scripts has . . . the unilateral and unchecked authority to decide which pharmacies will be . . . eligible . . . to receive reimbursement" for sales to "85 million members"); ¶113 (noting that Express Scripts' has "force[d] retail pharmac[ies] to refrain from dispensing drugs via mail order delivery"). This power emanates from the fact that Express Scripts is the largest PBM in the United States and that, combined with CVS Health, makes up for 65% of PBM sales. *In re Visa Check/MasterMoney Antitrust Litig*., No. 96-cv-

---

[23] Express Scripts refers to the decision in *Park Irmat Drug Corp. v. OptumRx, Inc.*, 152 F. Supp. 3d 127 (S.D.N.Y. 2016), a case that concerned Irmat's termination from the OptumRx network for engaging in mail-order sales and which eventually settled. Contrary to Express Scripts' suggestion, Judge Rakoff did not render any holding in that case concerning whether negative tying can violate Section 1. Nor could he have, in light of *Kodak*.

5238(JG), 2003 U.S. Dist. LEXIS 4965, at *27 (E.D.N.Y. April 1, 2003) (denying summary

judgment on tying claim where defendant wielded a mere 26% share).[24]

## V.    The Complaint Sufficiently Pleads Claims for Violation of State AWP Laws.

The Complaint also states well-pleaded claims for violations of Mississippi's, North

Carolina's, and Georgia's AWP laws.  *See* Compl. ¶¶ 128-142.  Express Scripts' prohibition on

independent pharmacies dispensing mail-order prescriptions to its members in those states –

while allowing its own pharmacy to do so – violates these AWP laws.  Express Scripts does not

deny that these statutes, in sum and substance, mandate that *any* pharmacy that meets the

standard terms offered by a pharmacy network be allowed to participate in that network.  Express

Scripts also does not deny that pharmacies have private rights of action under these statutes.[25]

**CONCLUSION**

For the foregoing reasons, Express Scripts' motion should be denied.

---

[24]    Express Scripts cites *Baxley-DeLemar Monuments, Inc. v. American Cemetery Ass'n,* 938 F.2d 846 (8th Cir. 1991) to support its contention that the market power allegations made here do not support a tying claim.  That summary judgment decision concerned a dismissal that was predicated on the failure of the plaintiff to prove that "each of the individual defendants had a uniqueness advantage over competitors." *Id.* at 852.  Here, the Complaint specifies that the patients controlled by Express Scripts, who do not choose their PBM services, are unique.

[25]    With respect to Mississippi's and North Carolina's statutes, Express Scripts contends that these statutes apply only to health plans, and not PBMs.  Express Scripts is wrong.  Neither of the cases relied on by Express Scripts for this argument – *Mississippi State & School Employees' Life and Health Plan v. KCC, Inc.*, 108 So. 3d 932 (Miss. 2013) and *Jacobs v. Physicians Weight Loss Center of America, Inc.*, 620 S.E.2d 232 (N.C. Ct. App. 2005) – addressed whether AWP laws apply to PBMs.  With respect to Georgia's AWP statute, Express Scripts claims that the Complaint fails to allege any conduct by Express Scripts that would violate the statute.  This is wrong.  The Georgia statute requires that network pharmacy contracts offered in the state of Georgia shall "be offered to all pharmacies located within those counties wherein reside enrollees in that program . . . ." Ga. Code Ann. § 26-4-144(a)(9).  Since at least September 30, 2016, Irmat has been a pharmacy licensed in Georgia and dispensed pharmaceuticals to customers in Georgia. Compl. ¶ 130.

Dated: St. Louis, Missouri        By:   s/ Richard B. Korn
        June 2, 2017

Richard B. Korn, #54570MO
rkorn@foxgalvin.com
FOX GALVIN, LLC
One S. Memorial Dr., 12th Floor
St. Louis, Missouri 63102
(314) 588-7000
(314) 588-1965 Fax

CONSTANTINE CANNON LLP
Matthew L. Cantor *(pro hac vice)*
mcantor@constantinecannon.com
Robert L. Begleiter *(pro hac vice)*
rbegleiter@constantinecannon.com
David A. Scupp *(pro hac vice)*
dscupp@constantinecannon.com
335 Madison Avenue
New York, New York 10017
(212) 350-2700

ATTORNEYS FOR PARK IRMAT
DRUG CORP.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 2nd day of June, 2017, the foregoing was filed electronically with the Clerk of the Court, to be served via operation of the Court's electronic filing system upon all counsel of record.

Christopher A. Smith
Sarah C. Hellmann
Jason M. Husgen
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Phone: (314) 480-1500
chris.smith@huschblackwell.com
sarah.hellmann@huschblackwell.com
jason.husgen@huschblackwell.com

26

James A. Keyte
Clifford H. Aronson
Robert A. Fumerton
Patrick G. Rideout
Peter S. Julian
Luke T. Taeschler
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000
james.keyte@skadden.com
clifford.aronson@skadden.com
robert.fumerton@skadden.com
patrick.rideout@skadden.com
peter.julian@skadden.com
luke.taeschler@skadden.com

ATTORNEYS FOR DEFENDANTS


s/ Richard B. Korn
_____

27