| | | |
|---|---|---|
| PARK IRMAT DRUG CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-CV-0979 RLW |
| | ) | |
| EXPRESS SCRIPTS HOLDING COMPANY | ) | |
| and EXPRESS SCRIPTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This case is before the Court on the motion of Express Scripts Holding Company and Express Scripts, Inc., to dismiss for failure to state a claim the eight-count complaint filed against them by Park Irmat Corp. For the reasons set forth below, the motion will be granted.

### Background

Accepting as true the allegations in the complaint, *see Tension Envelope Corp. v JBM Envelope Corp.*, 876 F.3d 1112, 1116 (8th Cir. 2017), the following gave rise to this action.

Express Scripts Holding Company and Express Scripts, Inc. (collectively referred to in the complaint as "Express Scripts") administer pharmacy benefits for third parties and also own and operate a mail-order pharmacy. (Compl. ¶¶1, 18; ECF No. 1.) Express Scripts is the largest pharmacy benefits manager ("PBM") in the United States, with over 97 percent of all retail pharmacies participating in its network. (*Id.* ¶17.) A PBM "manage[s] the pharmacy benefits for health plans and self-insured entities, negotiate[s] drug discounts with pharmaceutical manufacturers, and develop[s] . . . lists of drugs approved for reimbursement." (*Id.* ¶28.) The decision of which PBM to use is made by patients' health insurance plans, which are usually chosen by patients' employers. (*Id.* ¶29.) "For a pharmacy that is not owned by a PBM to

operate successfully, it is essential for the pharmacy to participate in all of the largest PBMs' networks, including Express Scripts'." (*Id.* ¶30.) To do so, independent pharmacies either contract directly with PBMS or indirectly through the pharmacy's agent, usually a Pharmacy Services Administrative Organization ("PSAO"). (*Id.* ¶31.)

Park Irmat Corp. ("Irmat"), a New York-based pharmacy in business since 1978, began concentrating on dermatological pharmaceuticals in 2013. (*Id.* ¶¶34-35.) "As Irmat's dermatology business began to flourish, Irmat agreed to participate in patient assistance programs sponsored by leading drug manufacturers." (*Id.* ¶36.) Under such a program, the manufacturer covers a portion of the patient's insurance co-payment, thereby "allow[ing] patients to obtain medications that their doctors prescribe without having to make burdensome . . . co-payments . . . ." (*Id.*) Participation in these programs provided Irmat with the "opportunity to significantly expand its business." (*Id.*) "[The] manufacturers provided Irmat with marketing channels and a potential customer base that extended nationwide." (*Id.* ¶37.) Consequently, "Irmat could no longer confine its operations to its Park Avenue storefront . . . [and] began providing mail-order services to customers throughout the country." (*Id.*) "From 2012 to 2015, Irmat's business grew exponentially, both in revenue and geographic scope." (*Id.*) Its staff drew from 20 employees in 2012 to a high of 208. (*Id.*) Also in 2012, Irma enrolled with a PSAO, AccessHealth, thereby gaining access to over 100 payors' pharmacy networks, including Express Scripts. (*Id.* ¶40.)

In October 2014, Express Scripts, Inc. ("ESI") sent a Pharmacy Provider Agreement (the "Agreement"). (Compl. Ex. 3.) This Agreement provided, in relevant part,

> 1.4 "Pharmacy" or "Pharmacies" means the pharmacy or pharmacies listed on Exhibit B . . . which are owned or operated by Provider, . . . meets the definition of Retail Provider (as defined in Section 1.8) and has been approved by ESI to provide services hereunder. . . .

2

1.8 "Retail Provider" shall mean a pharmacy that primarily fills and sells prescriptions via a retail, storefront location, is determined by ESI to fulfill an ESI business need with respect to participation in its retail network(s), and meets such other criteria established by ESI from time to time including any specific needs of a population, as determined by ESI in its sole discretion. "Retail Provider" shall not include mail order, specialty, home infusion, dispensing physician or internet pharmacies or such other provider types that do not meet ESI's Retail Provider criteria established from time to time.

2.2.b Credentialing and Recredentialing. Provider and its Pharmacies shall be eligible to provide services hereunder, including dispensing Covered Medications, only upon satisfaction of any credentialing/recredentialing and additional requirements imposed by ESI, including the providing of prompt written notice with any updates to the Provider Certification, as further prescribed in the Provider Manual. Failure to provide prompt updated information to the Provider Certification or to comply with Provider's obligations . . . or any other credentialing/recredentialing requirements required by ESI from time to time shall constitute a breach of this Agreement and ESI may terminate Provider . . . in ESI's sole discretion.

4.1 Term. Unless earlier terminated as provided in Section 4.2 of this Agreement, the term of this Agreement shall begin on the Effective Date and continue for a period of three (3) years . . . .

4.2 Termination.

4.2.a Without Cause. This Agreement may be terminated by ESI without cause upon at least thirty (30) days written notice to Provider . . . , with such termination effective at the end of such notice period.

4.2.b Breach. In the event a party defaults in the performance of any of its obligations under this Agreement (the "Defaulting Party"), the other party (the "Non-Defaulting Party") may give written notice to the Defaulting Party of such breach. . . . These rights and remedies are in addition to any and all other rights that exist or are available or may exist or be available to ESI pursuant to this Agreement, at law or in equity.

4.2.c Immediate Termination. Notwithstanding the provisions contained in Section 4.2.b, ESI shall have the right to immediately terminate this Agreement upon written notice to Provider in the event that . . . (v) [Provider] no longer meets credentialing requirements . . . .

7.9 Waiver. No waiver of a breach of any covenant or condition shall be construed to be a waiver of any subsequent breach. No act, delay, or omission done, suffered, or permitted by the parties shall be deemed to exhaust or impair any right, remedy, or power of the parties hereunder.

(Compl. Ex. 3 at 4, 5, 8, 12.) Irmat was identified in the Agreement as the Pharmacy. (*Id.* at 3.) No pharmacies were listed on the Exhibit B form. (*Id.* at 16.)

In July 2015, Irmat was required by ESI to submit a re-credentialing application. (Compl. ¶44 & Ex. 1.) This application included eight practice types. (Ex. 1. at 6, 22.) Irmat checked "Open Door Retail/Community" and "Mail Order." (*Id.*) The former was 35 percent of its business; the latter was 65 percent. (*Id.*) Of the mail order business, 5 percent was local and 95 percent was out-of-state. (*Id.*) The application also asked, among other things, the names and license numbers of the pharmacists, the Drug and Enforcement Administration and the Medicaid license numbers of the pharmacy, the hours of operation, whether the pharmacy was an open-door pharmacy that filled prescriptions for walk-in customers, whether the pharmacy had been the subject of any disciplinary or legal action, and whether the pharmacy provided any compounding services. (*Id.* at 6-12, 22-30.) In response to a question whether the pharmacy had previously participated in an ESI or Medco[1] pharmacy network, Irmat replied it had as of June 2013. (*Id.* at 23.) The completed application was submitted on July 31, 2015. (*Id.* at 18, 30.)

On August 7, ESI sent Irmat a two-sentence email. (Compl. ¶45 & Ex. 2 at 2.) The subject was "Express Scripts credentials approved" and the signatory was "Express Scripts Provider Credentialing." (Ex. 2 at 2.) The first sentence read: "We are pleased to inform you that your recently submitted credentials have been reviewed and you are approved to continue in the Express Scripts Holding Company pharmacy networks." (*Id.*) The other sentence read: "To access member and claims information, Payer Sheets and regulatory information register at our Pharmacist Resource Center." (*Id.*) It was sent from an email box that did not receive emails but had the name of "Ingrid Dominguez" at the top. (*Id.*) There is no indication of what position at

---

[1]Medco Health Solutions was acquired by Express Scripts in April 2012. (Compl. ¶17.)

4

Express Scripts Ms. Dominguez held; she did not sign the Agreement. (*Id.*; Compl Ex. 1-3 at 14.)

Relying on the first sentence, "Irmat made substantial investments in its mail-order business," including "hir[ing] scores of employees, construct[ing] a multi-million dollar facility in New York," and spending "considerable time and resources to obtain" two pharmaceutical industry accreditations. (*Id.* ¶46.)

In May 2016, "Express Scripts sent Irmat a cease-and-desist letter." (*Id.* ¶47.) The primary infraction allegedly committed by Irmat "was dispensing medications to Express Scripts members by mail." (*Id.*) "Express Scripts' letter wrongly claimed that Irmat misrepresented the nature of its pharmacy operations." (*Id.*) Other alleged infractions included "fail[ing] to use its best efforts to achieve formulary compliance" and discounting member copayments. (*Id.* ¶48-49.) The latter apparently referred to the co-payment assistance programs Irmat participated in with drug manufacturers. (*Id.* ¶49.) Both allegations were incorrect. (*Id.* ¶48-49.)

In June 2016, Irmat replied to the letter, "remind[ing] Express Scripts" of its August 2015 email representations and of its erroneous allegations about Irmat's formulary compliance and copayment collections. (*Id.* ¶50.) Irmat also reminded Express Scripts of its earlier inquiry into whether Express Scripts maintained a separate mail-order pharmacy network and, when being informed it did not, of Irmat's willingness to join one should Express Scripts establish such a network. (*Id.*)

By letter dated July 15, 2016, Express Scripts informed Irmat it was terminating Irmat from the network effective September 14, 2016. (*Id.* ¶51.) Reasons given were Irmat's mail-order business, in contravention of the definition of "'retail provider,'" and alleged failure to use its best efforts to dispense formulary drugs. (*Id.*) Irmat appealed its termination, "again noting

5

that Express Scripts expressly approved Irmat's mail-order business" and again explaining that its dispensation of formularies was in compliance with New York law. (*Id.* ¶52.) On August 22, fourteen days after Irmat's appeal, Express Scripts informed Irmat its decision to terminate Irmat was affirmed and, in addition to the reasons earlier given, cited three disputes Irmat had had with state boards of pharmacy – disputes Irmat had already resolved. (*Id.* ¶53.) Express Scripts further stated that it was terminating Irmat "'without cause'" and also for cause based on the alleged infractions. (*Id.*)

Express Scripts' termination of Irmat from its networks has caused Irmat "catastrophic injury" and significant harm to Irmat's customers. (*Id.* at 16.)

The foregoing course of dealing between Express Scripts and Irmat reflects a conspiracy between Express Scripts and co-conspirator PBMs, including CVS Health Corporation ("CVS Health"), to suppress competition from independent pharmacies, including Irmat, for mail-order pharmacy business. (*Id.* at 1, 2-3, 5, 17.) All the co-conspirator PBMs belong to a trade association, the Pharmaceutical Care Management Association ("PCMA"). (*Id.* ¶3.) Indeed, executives of Express Scripts and the co-conspirator PBMs serve on the PCMA's board of directors. (*Id.* ¶84.) "PBMs manage 95% of all the drugs prescribed and covered under group and individual health plans in the country. Express Scripts, CVS Health, and the two other largest PBMs control approximately 80% of the PBM market," with "Express Scripts and CVS Health alone cover[ing] over 65% of this market." (*Id.* ¶75.) CVS Health terminated Irmat from its pharmacy health networks in January or February 2017[2] "after conducting several abusive audits of Irmat." (*Id.* ¶¶11, 91, 92.) Irmat had been a participant in the networks since 2012, and been subjected "for a number of years" to meritless audits. (*Id.* ¶91.)

---

[2]Irmat refers to both months in its complaint as being when CVS Health terminated it.

6

Irmat alleges that the anticompetitive conduct of Express Scripts prevents customers "from obtaining the benefit of competitive pharmacy expertise," harms those customers who would benefit from Irmat's dermatological expertise, and "deprives consumers of the cost-saving benefits that they enjoy through Irmat's participation in drug manufacturer patient assistance programs." (*Id.* ¶80-81.) Moreover, Express Scripts' conduct violates the Sherman Act, breaches their contract, and violates three states' Any Willing Provider laws. (*Id.* ¶13.) Express Scripts counters that Irmat has failed to state a claim for any of the purported violations or breach.

## Discussion

Rule 12(b)(6) Standard. "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claims is and the grounds on which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Federal Rule of Civil Procedure 12(b)(6) does not require detailed factual allegations, but does require "more than labels and conclusions"; "a formulaic recitation of a cause of action will not do." *Id.* Thus, to survive a 12(b)(6) motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *McShane Constr. Co. v. Gotham Ins. Co.*, 867 F.3d 923, 927 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "'[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific

task that requires [this] [C]ourt to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678-79) (second and third alterations in original).

In *Twombly*, the Supreme Court addressed the question whether a complaint alleging violations of § 1 of the Sherman Act included sufficient factual matter to survive a Rule 12(b)(6) challenge. 556 U.S. at 554-55. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. This is so even if the conduct is "consciously undertaken." *Id.* at 557. Additionally, the Court noted that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Id.* at 558 (interim citation omitted).

Count I: Illegal Group Boycott. Irmat first claims that the continuing conduct of Express Scripts and its co-conspirators is an illegal group boycott in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. "Liability under § 1 of the Sherman Act . . . requires a 'contract, combination . . . , or conspiracy, in restraint of trade or commerce.'" *Twombly*, 550 U.S. at 548 (quoting 15 U.S.C. § 1). "'[T]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express.'" *Id.* at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (first alteration added). "Concerted action forms the essence of a § 1 claim, unilateral actions do not give rise to antitrust liability under § 1." *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F.Supp.2d 694, 703 (D. Minn. 1998).

Express Scripts argues that Irmat's claim lacks the specificity required by *Twombly* in that Irmat fails to (a) identify any communication between anyone at Express Script and another PBM; (b) allege any specific PCMA meeting at which the alleged conspiracy was conceived; and (c) allege any context removing the complained-of conduct from the realm of lawful parallel

conduct. In response, Irmat argues that it has alleged many of the same plus factors found in this District to be sufficient in "the Compounding Cases" -- antitrust cases brought by compounding pharmacies against one or more PBMs, including Express Scripts, Inc., and Express Scripts Holding Company – to withstand a Rule 12(b)(6) motion. *See HM Compounding Servs., Inc. v. Express Scripts, Inc.*, 2015 WL 4162762 (E.D. Mo. July 9, 2015); *Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, 2016 WL 4446801 (E.D. Mo. Aug. 24, 2016)[3]; *Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 WL 365434 (E.D. Mo. Jan. 25, 2017).

"[C]ommon motive does not suggest an agreement." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015); *accord In re Late Fee and Over-Limit Fee Litig.*, 528 F.Supp.2d 953, 964 (N.D. Cal. 2007). A market, e.g., pharmacy networks, may be interdependent, but that interdependence "does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." *Musical Instruments*, 798 F.3d at 1195.

"'[I]t is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence – often referred to as the "plus factors."'" *Precision Rx Compounding*, 2016 WL 4446801 at *2 (quoting *Minn. Ass'n of Nurse Anesthetists*, 5 F.Supp.2d at 704). "[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated conduct." *In re Musical Instruments*, 798 F.3d at 1194. Such "plus factors" may include (1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) "a high-level of interfirm communication exist[ing] in conjunction with the parallel actions." *Minn. Ass'n of Nurse Anesthetists.*, 5 F.Supp.2d at 704; *In re Musical Instruments*, 798 F.3d at 1194-

_____

[3]This case was transferred to the undersigned in July 2017.

9

95; *Precision Rx Compounding*, 2016 WL 4446801 at *2; *In re Late Fee and Over-Limit Fee*, 528 F.Supp.2d at 963-64.

Irmat argues that it, as did the compounding pharmacies in the three cases cited above, has sufficiently alleged a motive to conspire. The allegations include a common course of conduct among the PBMs to foreclose Irmat and the other independent mail-order pharmacies. For instance, "since 2014, the PBM conspirators engaged in abusive audits of competitor pharmacies, terminations of them, and unconscionable contracting practices." (Pl.'s Resp. at 16-17, ECF No. 32.) The motive attributed by Irmat to Express Scripts' decision to terminate it from its network was to preclude it from the mail order pharmacy networks because Express Scripts operated its own such network. Irmat has submitted, however, an agreement with Express Scripts signed by Irmat in October 2014 representing that it was primarily a retail pharmacy, not a mail-order pharmacy. (As discussed below, that agreement was not unconscionable, nor was it novated.) Conversely, the pharmacy network Irmat participated in with CVS Health was a mail-order network. It joined this network three months after it was sent a cease-and-desist letter from Express Scripts and the month after it was terminated from Express Scripts' network. (Compl. ¶91-92.) Irmat alleges it was terminated from the CVS Health network without cause after a four-month period of being reimbursed at lower rates than before it joined the network and being denied the ability to dispense 90-day supplies of prescriptions through that network. (*Id.*) *Cf. In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp.2d 1011, 1023 (N.D. Cal. 2007) (finding allegations of actions taken within three months of each other to "fall short of unusual, lockstep ... behavior" indicative of a conspiracy). And, although Irmat alleges CVS Health subjected it to abusive audits beginning in 20*12*, it does not allege that Express Scripts has. Although the result of Express Scripts' and CVS Health's conduct is that

10

Irmat does not now participate in either PBM's networks as a mail-order pharmacy, the difference in how that result came to be does not suggest a common motive.

Nor has Irmat alleged any action taken by Express Scripts that is against its self-interest. "Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3rd Cir. 2004). In the two compounding cases in which self-interest was discussed, the disclosure by Express Scripts to other PBMs of a detailed business plan to save money by eliminating coverage for compounded medications was held to sufficiently allege an action taken against self-interest. *See Grasso Enters.*, 2017 WL 365434 at *5; *Precision Rx Compounding*, 2016 WL 4446801 at *4. According to the allegations in those complaints, this plan was presented by Express Scripts in a PowerPoint document to third-party payors, published on Express Scripts' website, and described in a newspaper article. [4] *Grasso Enter.*, No. 4:14cv01932 HEA, Amended Complaint at 20-30; *Precision Rx Compounding,* No. 4:16cv00069 RLW, Amended Complaint at 20-31.

Another "plus factor" to consider is market concentration. Irmat alleges that Express Scripts and CVS health cover 65 percent of the PBM market and, with the two other largest PBMs, cover 90 percent. In *In re Late Fee and Over-Limit Fee Litig.*, 528 F.Supp.2d at 964, the court, relying on *Twombly*, held that a combined 70 percent share of the credit card market did not describe a concentration conducive to conspiracy. Moreover, Irmat is not alleging that it wishes to compete as a PBM; rather, it is alleging that it wishes to use the various pharmacy networks to dispense mail-order prescriptions. Irmat is also alleging that it gained access in 2012 to over 100 networks.

---

[4] The Court notes that the plan is detailed in the two complaints and is attached as an exhibit to each.

Irmat contends that it has sufficiently described a high-level of interfirm communication when alleging that the PBM co-conspirators controlled the relevant trade association. (Pl.'s Resp. at 17.) Specifically, Irmat has alleged that Express Scripts and its co-conspirators are active members of the PCMA and that their executives serve on the PCMA's board of directors, including Tim Wentworth, the President of Express Scripts, and Jon Roberts the President of CVS/Caremark and Executive Vice-President of CVS Health. (Compl. ¶¶83-84.) Irmat further alleges that "Express Scripts and its co-conspirators joined together in approximately 2014 – through the PCMA and/or otherwise – to collectively determine how best to eliminate coverage for the provision of mail-order pharmacy services by independent pharmacies." (*Id.* ¶87.)

In *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F.Supp.2d 1250 (W.D. Wa. 2009), the court noted that a distinguishing factor in opposite results reached by courts after *Twombly* about the sufficiency of antitrust allegations on a motion to dismiss was "the inclusion of specific allegations concerning the time, place, and person versus general allusions to 'secret meetings,' 'communications,' or agreements.'" *Id.* at 1256-57 (citing a Second Circuit case and district court cases from California, Pennsylvania, New York, and Georgia). In the case before it, the plaintiffs had "offer[ed] no particulars concerning the locations or dates of any meetings, and although they name[d] certain members of [an industry task force], they [did] not identify any individuals who might have been involved in any illicit communications" and "[made] no attempt to compare the timing of trade association meetings and fuel surcharge increases." *Id.* at 1257. *See also In re Graphics Processing Units*, 527 F.Supp.2d at 1024 (allegations of parallel behavior following attendance at same meetings insufficient to withstand motion to dismiss).

In the case before the courts in *Grasso Enterprises.* and *Precision Rx Compounding*, the plaintiffs allege that Express Scripts and its co-conspirators met during PCMA meetings about

12

designing and implementing a horizontal boycott of independent pharmacies, including at three specifically named times and locations. *Grasso Enters.*, No. 4:14cv1932 HEA, Second Am. Compl at 19-20 (ECF No. 79); *Precision Rx Compounding*, No. 4:16cv0069 RLW, First Am. Compl. at 20-21 (ECF No. 35). Following these meetings, various stages of Express Scripts' plan was implanted. *Grasso Enters.*, Second Am. Compl at 71; *Precision Rx Compounding*, First Am. Compl. at 74. For instance, the first step – a requirement that compounding pharmacies "obtain prior approval before filling prescriptions for the "Top 5' compounded drugs or ingredients" – occurred five months after a PCMA meeting in Las Vegas. *Grasso Enters.*, Second Am. Compl at 64, 72; *Precision Rx Compounding*, First Am. Compl. at 67, 75. Two months after the meeting in Rancho Palos Verdes, a pharmacy re-credentialing program was to begin *Grasso Enters.*, Second Am. Compl at 64, 74; *Precision Rx Compounding*, First Am. Compl. at 67, 77. Two months after the District of Columbia meeting, Express Scripts' "Compound Management Solution" was to be launched. *Grasso Enters.*, Second Am. Compl at 64, 73; *Precision Rx Compounding*, First Am. Compl. at 67, 78. The express purpose of this Solution was to eliminate "95% Compound Spend." *Grasso Enters.*, Second Am. Compl at 24; *Precision Rx Compounding*, First Am. Compl. at 25. To assist in this purpose, the PowerPoint included specific text to be included in form letters sent to patients using compound medicines; this text included, inter alia, a notice that the Food and Drug Administration did "not verify the quality, safety and/or effectiveness of compounded medications" and a caution that patients may have to pay the full cost if they continued to use compounded medications. *Grasso Enters.*, Second Am. Compl at 24-26; *Precision Rx Compounding*, First Am. Compl. at 25-27.

Irmat names two PBM executives, including one from Express Scripts, that serve on the PCMA board of directors. This presence is characterized by Irmat as *"controll[ing]"* the

association. (Pl.'s Resp. at 17; emphasis in original.) Again, this allegation falls short of the sufficiency required by *Twombly*. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (participation by defendants on same board of directors insufficient to support antitrust conspiracy claim). The allegation lacks temporal context and is not, in and of itself, indicative of any anticompetitive influence. *See In re Travel Agent Com'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[M]ere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the co-conspirators'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.") citing *Iqbal*, 556 U.S. at 679).

Count II: Monopoly. "Section 2 of the Sherman Act provides that it is unlawful to 'monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations.'" *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2nd Cir. 2014) (quoting 15 U.S.C. § 2) (alteration in original). "'[T]his offense requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Id.* (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)) (alteration in original). *See also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (§ 2 claim requires, in addition to monopoly power in relevant market, the use of that power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor").

Irmat alleges Express Scripts has used the monopoly power it has achieved as an owner and operator of a mail-order pharmacy to (a) "prevent its millions of members from obtaining the benefit[s] of Irmat's expertise in dermatological pharmaceuticals" and of "Irmat's renowned exceptional customer service" and (b) cause a price increase for pharmaceuticals Express

14

Scripts' members can obtain through the manufacturer coupon programs offered by Irmat. (Compl. ¶106.) Express Scripts counters that Irmat has failed to allege a plausible relevant market or anticompetitive conduct by Express Scripts.

"'It is [Irmat's] burden to define the relevant market,'" which "'has two components – a product market and a geographic market.'" [5] *Double D Spotting Serv. Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (quoting *Bathke v.Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995)). Irmat alleges that the relevant product market "is the market for mail-order pharmacy services." (Compl. ¶67.) Within a broad product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). Irmat alleges there is a submarket – "the market for mail-order pharmacy services to Express Scripts members." (Compl. ¶69.)

"'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (8th Cir. 1997) (quoting *Brown Shoe Co.*, 370 U.S. at 325). "In other words, the product market can be determined by analyzing how 'consumers will shift from one product to the other in response to changes in their relative costs.'" *HDC Med., Inc. v. Minnitech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) (quoting *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir. 1981)). "The higher the cross-elasticity of demand, the more buyers consider the two products substitutes for each other, and the more sensible it is to describe them within the same market." *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1538 (8th Cir. 1969).

---

[5]Express Scripts does not take issue with Irmat's description of the geographic market being the United States.

Addressing Irmat's submarket description, Express Scripts argues that it cannot monopolize a market for mail order pharmacy services provided solely to its own third-party payer clients. As alleged by Irmat, the mail-order pharmacy owned by Express Scripts is the only pharmacy in its network that is allowed to mail prescriptions to Express Scripts' members. (Compl. ¶18.) As further alleged by Irmat, the decision of which PBM to choose is made by patients' health insurance plans, plans which, in turn, are generally chosen by an employer. (*Id.* ¶29.) An Express Scripts member, i.e., the health insurance plan chosen by the patient's employer, is very unlikely to change from Express Scripts to another PBM if the patient's preferred pharmacy is terminated from Express Scripts' network. (*Id.* ¶¶29, 72.)

In *Queen City Pizza*, the Eighth Circuit found a similar claim, albeit concerning pizza ingredients rather than prescription drugs, failed to describe a relevant product market. 124 F.3d at 438. In that case, plaintiffs – Domino franchisees – argued that Domino's Pizza, Inc., violated § 2 of the Sherman Act by requiring that they buy their pizza supplies from it. *Id.* at 434. The plaintiffs argued that "the ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores constitute[d] a relevant market for antitrust purposes." *Id.* at 437. Rejecting the plaintiffs' argument that a relevant market existed because only Domino's approved products could be used by Domino's franchisees without violating the franchise agreement, the court held that "[t]he test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purpose.'" *Id.* at 438 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). "A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by

16

consumers in general." *Id.* In the instant case, the consumer is the health insurance plan, not the individual patient, and, absent a contractual relationship, the plan is free to use another PBM. *See Id.* ("Were we to adopt plaintiffs' position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, . . . or requirement contract . . . would support a claim for violation of antitrust laws. Perhaps for this reason, no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff."). *See also Brokerage Concepts Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 514 (3rd Cir. 1998) ("Product market definition turns on the existence of close substitutes for a particular product, not on the ability of any particular consumer to switch effortlessly to such substitutes.")

Citing *Eastman Kodak*, 504 U.S. at 451, Irmat argues that it has sufficiently described a "'single brand' relevant market" to withstand a Rule 12(b)(6) motion to dismiss. As noted by Irmat, the Supreme Court held in that case that "the relevant market from the Kodak equipment owner's perspective is composed only of those companies that service Kodak machines." *Id.* at 482. The quoted clause was preceded by the observation that "service and parts for Kodak equipment are not interchangeable with other manufacturers' services and parts." *Id.* Rather, replacement parts for its equipment – expensive equipment that had little resale value and was not compatible with other manufacturers' equipment -- were sold by Kodak only to those who used Kodak's service or repaired their Kodak equipment themselves. *Id.* at 457, 458. And, Kodak arranged with independent original-equipment manufacturers to sell Kodak parts only to Kodak and with other parts distributors not to sell Kodak parts to independent service providers. *Id.* at 458. The circumstances in *Eastman Kodak* were described *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 562 F.Supp.2d 392, 403 (E.D. N.Y.

2008), "as where a product is so expensive that replacements are not affordable, and where the product is designed so that it can be repaired only with parts manufactured by the product's manufacturer." The court noted that "the term 'single-brand market' is more of a convenient shorthand than a full description: products are included in the market not because they originate from a single brand, but because consumers have no meaningful alternatives to a specific product if they wish to purchase any good to serve a particular purpose." *Id.* at 404. In the instant case, consumers are free to choose other PBMs, and Irmat does not content that Express Scripts is the only mail-order pharmacy. *See Prime Aid Pharmacy Corp. v. Humana, Inc.*, 2017 WL 2889677, *4 (D. N.J. Mar. 2, 2017) (concluding that allegations of relevant market restricted to one PBM – one of nation's largest -- on grounds its insureds were "'locked in'" to using PBM's approved specialty pharmacies failed) ("Restriction to approved providers is inherent in any healthcare plans.").

Irmat correctly notes that the determination of relevant product market is fact-intensive. *Community Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1184 (8th Cir. 1998) but this is not "'a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed.R.Civ.P. 12(b)(6),'" *Sherr v. HealthEast Care Sys.*, 262 F.Supp.3d 869, 885 (D. Minn. 2017) (quoting *Queen City Pizza*, 124 F.3d at 436). Irmat has failed to adequately describe a relevant market.

Moreover, as noted above, in addition to adequately describing a relevant market, to state a monopolization claim under § 2 of the Sherman Act Irmat must sufficiently allege Express Scripts "'willfully acquired or maintained that power, as opposed to gaining it as a result of a superior product, business acumen, or historical accident.'" *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F.Supp.2d 912, 925 (E.D. Mo. 2010) (quoting *United States v.*

18

*Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407.

Irmat alleges that, due to the "market heft" of Express Scripts and its co-conspirators, a mail-order pharmacy without a PBM ownership must be a member of the PBM networks to remain viable. (Compl. ¶63.) Because Irmat is compliant with all relevant regulations and has an expertise in dermatological pharmaceuticals, the only reason for Express Scripts to terminate its agreement with Irmat is to eliminate Irmat as a competitor. (*Id.* ¶65-66.)

Citing *Trinko*, 540 U.S. at 408, Express Scripts argues that it is not obligated under § 2 of the Sherman Act "to deal with other market participants." (Def. Mem. at 20.) " '[T]he right to refuse to deal with other firms does not mean that the right is unqualified.'" *Id.* (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)). In *Aspen Skiing*, the Supreme Court affirmed a jury verdict finding a ski company had violated § 2 when selling at a discounted price a six-day lift ticket to the three ski areas it owned in Aspen after years of cooperating with the owner of the only other Aspen ski area in issuing a joint, multiple day ticket to all four ski areas. 472 U.S. at 610. In *Trinko*, the Court characterized the *Aspen* holding as being "at or near the outer boundary of § 2 liability." 540 U.S. at 409. In *Aspen*, "[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original). *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52-53 (2nd Cir. 2007) (per curiam) (discussing *Trinko* and distinguishing *Aspen Skiing* in action alleging violations of §§ 1 and 2 of the Sherman Act by elevator companies who controlled the maintenance market for their elevators).

Irmat argues that its allegations fall within the *Aspen Skiing* exception because Express Scripts' termination of its pre-existing relationship evidences an anticompetitive animus. (Pl. Resp. at 23.) This argument overstates the scope of that relationship. As discussed below, Irmat's agreement with Express Scripts defined Irmat as a retail pharmacy, whereas the premise of this action is Express Scripts' treatment of Irmat as a mail-order pharmacy. *See In re Adderall XR*, 756 F.3d at 135 (rejecting antitrust plaintiff's claim that *Aspen Skiing* exception applied because no prior course of dealing was terminated).

Count III: Tying. "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman* Kodak, 504 U.S. at 461 (quoting *Northern Pacific R. Co. v. United* States, 356 U.S. 1, 5-6 (1958)). "Such an arrangement violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.'" *Id.* at 462 (quoting *Fortner Enters. Inc. v. United States Steel Corp.*, 394 U.S. 495, 503 (1969)).

Irmat alleges that Express Scripts has illegally tied one distinct product, i.e., retail pharmacy services to Express Scripts' members, to an agreement not to sell another product, i.e., mail-order pharmacy services to Express Scripts' members. (Compl. ¶111.) In its response to the motion to dismiss, Irmat clarifies that it is alleging "that Express Scripts exercised its power as a PBM by forcing pharmacies to refrain from providing competitive mail order services to Express Scripts members as a condition for entry into the Express Scripts retail pharmacy network." (Pl. Resp. at 23.) In other words, Express Scripts demanded that Irmat not provide mail-order pharmacy services to its members in order to participate in Express Scripts' retail

pharmacy services network. Similar allegations – the conditioning of the sale of one product on an agreement not to purchase another – have been described as "negative tying." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F.Supp.3d 127, 139-40 (S.D. N.Y. 2016); *accord Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).

Other allegations in the complaint defeat Irmat's tying claim. Irmat alleges that it gained access to over 100 networks when it joined AccessHealth. There is no allegation that Express Scripts forbid Irmat from participating in one of the remaining 99 networks, including those such as CVS Health that included mail-order pharmacy services. Moreover, Irmat does allege that at some unspecified time it had inquired about "whether Express Scripts maintained a separate mail-order pharmacy network," had been informed that it did not, and had then informed Express Scripts that it would join such a network if one were established. (Compl. ¶50.) Thus, at best, the allegations establish that Irmat entered into an agreement with Express Scripts in October 2014 as a retail pharmacy and later attempted[6] to change its status to that of a mail-order pharmacy.

Count IV: Breach of Contract. Irmat argues that Express Scripts breached its contract with Irmat when terminating it for, inter alia, providing mail-order pharmacy services to Express Scripts' members. The August 2015 email from Express Scripts was a novation of the 2014 Agreement[7] and eliminated any restriction on Irmat providing those services. Moreover, Express

---

[6]Whether Irmat states a claim that this attempt transformed into a contract is addressed below.
[7]Irmat consistently describes the 2014 Agreement as a contract of adhesion. "An adhesion contract is a contract created by the stronger of the contracting parties and offered on a 'take this or nothing' basis." *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 438 (Mo. 2015) (en banc). "Under Missouri law . . . , the fact that a contract is one of adhesion does not necessarily make it invalid." *Id.* Rather, a court considers whether the terms imposed on the weaker party "'unexpectedly or unconscionably limit the obligations and liability of the drafting party.'" *Id.* (quoting *Robin v. Blue Cross Hosp. Servs., Inc.*, 637 S.W.2d 695, 697 (Mo. 1982) (en banc)). *See also Fuller v. TLC Property Mgt, LLC*, 402 S.W.3d 101, 111 (Mo.Ct.App. 2013) (en banc)

21

Scripts' decision violated the implied covenant of good faith and fair dealing that is inherent in every contract.

To state a claim under Missouri law [8] for breach of contract, Irmat must allege (1) there was a contract between Irmat and Express Scripts that included certain rights and obligations between the parties; (2) Express Scripts breached its obligation under the contract, and (3) the breach damaged Irmat. *D.R. Sherry Const., Ltd. v. American Family Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. 2010) (en banc). Irmat contends that the email was a novation to the parties earlier Agreement; Express Scripts then breached the new agreement by terminating Irmat; and the breach severely damaged Irmat.

> "Under Missouri law, a novation is the substitution of a new contract or obligation for an old one that is thereby extinguished. The four elements necessary for finding a novation are: (1) a previous valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of an old contract, and (4) validity of a new contract. In addition to these requirements, there must be evidence that the parties intended to enter into a novation. The burden of proof is on the party asserting the novation."

*Merrell v. Consumer Portfolio Servs., Inc.*, 2007 WL 530784, * 2 (W.D. Mo. Feb. 14, 2007) (quoting *State ex rel. Premier Marketing, Inc. v. Kramer*, 2 S.W.3d 118, 122 (Mo.Ct.App. 1999)).

"A novation is subject to the same rules as any other contract . . . ." *Kramer*, 2 S.W.3d at 122. *Accord American Nat'l Ins. Co. v. Noble Commc'ns Co.*, 936 S.W.2d 124, 131 (Mo.Ct.App. 1996). "'The essential elements of an enforceable contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of

---

(In Missouri, an adhesion contract, as opposed to a negotiated contract, has been described as a form contract created and imposed by a stronger party upon a weaker party on a take this or nothing basis, the terms of which unexpectedly or unconscionably limit the obligations of the drafting party.") (interim quotations omitted). Therefore, the Court examines whether the Agreement is unconscionable.

[8] The parties do not dispute that Missouri law governs the contract claims.

22

obligation.'" *Id.* (quoting *L.B. v. State Comm. of Psychologists*, 912 S.W.2d 611, 617 (Mo.Ct.App. 1995)).

Irmat alleges that the two-sentence email received one week after it submitted a re-credentialing application was a novation of the Agreement and, consequently, precluded Express Scripts from terminating Irmat from its network. The Court disagrees.

A basis for an immediate termination of the Agreement is the failure of the provider to meet credentialing requirements. Consistent with this concern, the Agreement mandated that Irmat provide, when requested by Express Scripts, updated information of the credentials of its pharmacy. The re-credentialing application submitted by Irmat on July 31, 2015, listed the license numbers of its pharmacists and the Drug and Enforcement Administration and Medicaid license numbers of Irmat and replied in the negative to a question whether the pharmacy had been the subject of any disciplinary or legal action. Irmat also reported on the application the percentage of its business that was mail-order. In return, one week later, Irmat received an email with the subject heading of "Express Scripts credentials approved"; a signature line simply reading "Express Scripts Provider Credentialing"; and one relevant sentence[9] reading "We are pleased to inform you that your recently submitted credentials have been reviewed and you are approved to continue in the Express Scripts Holding Company pharmacy networks."

This email is not a novation. There is no signature; however, "[a] signature is not essential to the binding force of an agreement." [10] *Weitz Co. v. MH Washington*, 631 F.3d 510,

---

[9]Irmat dismisses any argument that the brevity of the email militates against it being a novation, asking why Express Scripts sent it if it had no significance. (Pl. Resp. at 10.) The answer is simple. Consistent with the Agreement, Express Scripts has asked Irmat to submit a re-credentialing application; Irmat did so. The point of the email is clearly to let Irmat know that the credentialing information in that application was accepted.

[10]The Court notes there is also no electronic signature. The name of Ms. Dominquez appears in bold type and above a line separating her name from the remainder of the email.

519 (8th Cir. 2011). "[W]hether an unsigned writing is binding depends on the parties' intent." *Id.* There is no allegation in the complaint suggesting that Express Scripts evidenced an intent to substitute a new contract accepting Irmat as a mail-order pharmacy when sending an email from its credentialing department that Irmat's submitted re-credentialing application had been approved. Indeed, the use of "continue" indicates that Express Scripts' acceptance of Irmat's re-credentialing application meant Irmat could "carry on" as before. *See Contine*, Oxford English Dictionary, *http://www.oed.com/view/Entry/40270?rskey=B9SEn4&result=3&isAdvanced* (last visited Feb. 14, 2018).

The parties' intent is also necessary to show a mutuality of agreement. *See Warren v. Tribune Broadcasting Co.*, 512 S.W.3d 860, 864 (Mo.Ct.App. 2017). This intent may be expressed or manifested in the parties' words or acts. *Id.* There is no allegation of any word or act of Express Scripts that manifested any intent other than to consider Irmat as having complied with the credentialing portion of the Agreement.

Mutuality of obligation "mean[s] that an obligation rests upon each party to do or permit to do something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." *Reed v. Curators of Univ. of Mo.*, 509 S.W.3d 816, 825 (Mo.Ct.App. 2016). When Express Scripts sent the August 2015 email – the alleged novation – Irmat was already conducting a mail-order pharmacy business. Although Irmat alleges it expanded that business at great cost after receiving the email, there is nothing to suggest that Express Scripts permitted Irmat to conduct a mail-order business in consideration of that expansion. And, Irmat alleges that it began expanding its business two years prior to signing the Agreement when it started participating in drug manufacturers' programs and specializing in dermatological pharmaceuticals.

Continuing with its characterization of the email as being an express approval of Irmat continuing in Express Scripts' pharmacy network as a provider of mail-order pharmacy services, Irmat further argues that Express Scripts waived any objection when waiting nine months to send Irmat a cease-and-desist letter. "A waiver is an intentional relinquishment of a known right." *Star Dev. Corp. v. Urgent Care Assocs., Inc.*, 429 S.W.3d 487, 494 (Mo.Ct.App. 2014) (interim quotations omitted). "Where there is no express declaration of waiver, there must be a clear, unequivocal, and decisive act showing waiver implied by conduct." *Id.* (interim quotations omitted). As discussed above, the email shows nothing other than an acceptance of Irmat's re-credentialing application. *See Boswell v. Panera Bread Co.*, 2016 WL 1161573, \*14 (E.D. Mo. Mar. 24, 2016) ("To rise to the level of a waiver, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that *no other reasonable explanation* of the [the] conduct is possible.") (interim quotations omitted) (alteration in original). This is construction is strengthened by the inclusion of a provision in the Agreement expressly stating that a waiver is not to be presumed by an act of either party.

Additionally, the time-lag between the email and the letter does not constitute a waiver. *See Id.* ("Forbearance is not a waiver.") (interim quotations omitted).

Irmat next argues that Express Scripts' conduct "violate[d] the implied covenant of good faith and fair dealing inherent in every contract." (Compl. ¶123.) Irmat correctly notes that "'Missouri law implies a covenant of good faith and fair dealing in every contract.'" *Berringer v. JPMorgan Chase Bank, N.A.*, 16 F.Supp.3d 1044, 1048 (E.D. Mo. 2014) (quoting *Farmers' Elec. Coop., Inc. v. Mo. Dep't Corr.*, 977 S.W.2d 266, 271 (Mo. 1998) (en banc)). "'A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement . . . and denies

25

the expected benefit of the agreement.'" *Id.* (quoting *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo.Ct.App. 2012)). "The covenant of good faith and fair dealing does not establish a general reasonableness requirement"; rather, unreasonableness "serve[s] only as evidence of subjective intent to undermine fulfillment of the contract." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007) (interim quotations omitted).

The 2014 Agreement between Express Scripts and Irmat defined Irmat as primarily a retail pharmacy. Express Scripts' later termination of Irmat on the grounds it was then primarily a mail-order pharmacy business does not reflect bad faith because it earlier approved Irmat's re-credentialing application.

In support of its argument to the contrary, Irmat cites *HM Compounding Servs., LLC v. Express Scripts, Inc.*, 2017 WL 2118012 (E.D. Mo. May 16, 2017). This reliance is unavailing. In *HM Compounding*, the court had earlier found that the relevant contract provisions were ambiguous and a genuine issue remained whether the plaintiff had breached the contract, "thereby triggering [Express Scripts] right to terminate [plaintiff] from it provider network." *Id.* at *2. The court further found that a question remained whether the termination violated the duty of good faith and fair dealing because the alleged breach was based on a reasonable interpretation of the provision at issue. *See Id.*; *HM Compounding Servs., LLC v. Express Scripts, Inc.*, 2017 WL 467499, *7-8 (E.D. Mo. Feb. 3, 2017). In the instant case, there is no allegation that Irmat reasonably believed it was a "Retail Pharmacy" within the definition in the Agreement. As with its earlier arguments, Irmat bases its position on its construction of the 2015 email. The covenant of good faith and fair dealing cannot, however, "give rise to new obligations not otherwise contained in a contract's express terms." *Comprehensive Care Corp. v. Rehabcare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996). *See also Stone Motor Co. v. General*

*Motors Corp.*, 293 F.3d 456. 466 (8ᵗʰ Cir. 2002) ("general implied duty of good faith" does not "alter[] express terms of agreement); *Berringer*, 16 F.Supp.3d at 1048 (rejecting claim of violation of duty of good faith and fair dealing based on conclusory allegations of offer and acceptance of modification of agreement; complaint lacked any allegation that defendant had specifically agreed to refrain from course of conduct agreement authorized it to take upon plaintiff's default).

Additionally, the Agreement is not unconscionable because it includes a "one-sided at-will termination provision." (Pl. Resp. at 12.) "A bilateral contract is not rendered invalid and unenforceable merely because one party has the right to cancellation while the other does not. There is no necessity 'that for each stipulation in a contract binding the one party there must be a corresponding stipulation binding the other.'" *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 36 (8ᵗʰ Cir. 1975) (quoting *James B. Berry's Sons Co. v. Monark Gasoline & Oil Co.*, 372 F.2d 74, 75 (8ᵗʰ Cir. 1929)).

Describing Express Scripts' network's size and the take-it-or-leave-it nature of the Agreement, Irmat argues that the question of whether that Agreement is unconscionable "is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss." (Pl. Resp. at 13.) In support of this position, Irmat cites *Brewer v. Missouri Title Loans*, 364 S.W.3d 486 (Mo. 2012) (en banc). The plaintiff in *Brewer* had borrowed $2,215 from defendant; the loan was secured by the title to her car, had an annual percentage rate of 300 percent, and included a provision that any claims plaintiff might have against defendant be submitted to individual, not class, arbitration. *Id.* at 487. On remand from the United States Supreme Court, the court held that the plaintiff had established that the class arbitration waiver was unconscionable and the appropriate remedy was to revoke the class arbitration clause, not the entire arbitration agreement. *Id.* The

court further held that, in Missouri, "[t]he purpose of the unconscionability doctrine is to guard against one-sided contracts, oppression, and unfair surprise." *Id.* at 492-93. Evidence demonstrating unconscionability in that case included that the entire agreement was one-sided and difficult for the average consumer to understand; the defendant was in a superior bargaining position; the terms of the agreement were one-sided; and the plaintiff was without counsel. *Id.* at 493-94.

In *Mantle v. Ad Astra Recovery Servs., Inc.*, 2013 WL 3480311, *5 n.2 (E.D. Mo. July 10, 2013), the *Brewer* decision analyzed "unconscionability" in the context of arbitration agreements. Three years after *Brewer*, the Missouri Supreme Court rejected an argument in *Eaton.*, 461 S.W.3d at 434, that the an agreement was not unconscionable because the author of the preprinted contract had a unilateral right to invoke arbitration and the other signatory did not. The court declined to hold the agreement unconscionable "solely due to lack of mutuality" based on the author having a contractual obligation the other signatory did not. *Id. See also Jump v. Manchester Data Sciences Corp.*, 424 F.Supp. 442, 444 (E.D. Mo. 1975) ("The general rule is that courts will not declare an agreement [unconscionable] simply because it is unwise.").

In *Turner v. Ferguson*, 149 F.3d 821 (8th Cir. 1994), the claim of unconscionably arose in the context of a limited partner's suit against a general partner after property was sold by the partnership to the general partner for significantly less than offered by a competing bidder. An amendment to the partnership agreement – approved by a simple majority of the limited partners – waived any conflict of interest claim the partnership might have against the general partner. *Id.* at 822-23. The question before the court was whether the general partner unconscionably profited from the sale in his role; it was this question that was held not to be the sort of question "normally" able to be decided as a matter of law. *Id.* at 824.

The instant case does not require the fact-intensive inquiry advocated by Irmat. Irmat alleges it gained access to over 100 networks when joining AccessHealth. Express Scripts' requirement that Irmat sign its preprinted agreement in order to participate in Express Scripts' large network does not make that agreement unconscionable. *See e.g. Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 264 (5ᵗʰ Cir. 2014) (rejecting similar argument under Arizona law regarding PBM contract); *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F.Supp.2d 1172, 1180-81 (N.D. Ca. 2013) (same under California law).

Count V:  Promissory Estoppel. [11]  "Under Missouri law, a claim for promissory estoppel allows the courts to enforce a promise on equitable grounds even if the parties have not entered into a contract." *Butano v. Wells Fargo, N.A.*, 2014 WL 3384733, *4 (E.D. Mo. July 10, 2014). "It cannot be used to create rights not included within the contract." *Saey v. Xerox Corp.*, 31 F.Supp.2d 692, 698 (E.D. Mo. 1998). "Promissory estoppel requires: 1) a promise; 2) on which a party relies to his or her detriment; 3) in a way the promisor expected or should have expected; and 4) resulting in an injustice that only enforcement of the promise could cure." *Butano*, 2014 WL 3384733, *4. "'In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly appear and be proven by the party seeking its enforcement.'" *Id.* (quoting *Glenn*, 360 S.W.3d at 877). "'[A] party cannot enforce another party's promise through promissory estoppel when they made an unambiguous contract on the same subject matter.'" *Restored Images Consulting, LLC v. Dr. Vinyl & Associates, Ltd.*, 2016 WL 4036049, *10 (W.D. Mo. July 27, 2016) (quoting *Clearly Canadian Beverage Corp. v. Am. Winery, Inc.*, 257 F.3d 880, 890 (8ᵗʰ Cir. 2001)).

---

[11]Irmat clarifies in its response that its claim in Count V is for promissory estoppel, not equitable estoppel as titled in the complaint.

Irmat's promissory estoppel count fails to state a claim as to the first and third elements. As discussed above, the August 2015 email, on which Irmat relies for this claim, is not a promise or a novation. *See e.g. Clearly Canadian*, 257 F.3d at 890 (rejecting claim that promissory estoppel required Clearly Canadian to order specific levels of production when expectation was based on business projections in correspondence but contract lacked such requirement). The court in *Clearly Canadian* noted that the parties' contract included a standard integration clause. *Id.* The Agreement also includes such a clause. Nor is there any allegation that supports an inference that Express Scripts should have anticipated that its unsigned email regarding Irmat's credentials would be construed by Irmat as a novation of an essential provision of their Agreement.

Counts VI, VII, and VIII: Any Willing Provider Laws. The last three counts of the complaint allege violations of the Any Willing Provider Law of Georgia, Mississippi, and North Carolina, respectively. Specifically, Irmat alleges that Express Scripts violated each of the three states' laws when refusing Irmat permission to mail prescriptions to Express Scripts' members in those states.

Georgia's applicable Any Willing Provider Law, Ga.Code § 26-4-144, governs third-party prescription programs. It provides, in relevant part, provides that:

9) That at least 30 days prior to the date a program becomes effective, the program contract therefor shall be offered to all pharmacies located within those counties wherein reside enrollees in that program, which pharmacies shall have at least 30 days from the time they receive the offer to accept that offer and become participating pharmacies[.]

Mississippi's applicable Any Willing Provider Law, Miss.Code. § 83-9-6, applies "to all health benefit plans providing pharmaceutical services benefits ... to any resident of Mississippi." *Id.* § 83-9-6(1). "A health insurance plan, policy, employee benefit plan or health

maintenance organization may not . . . [d]eny a pharmacy or pharmacist the right to participate
. . . if the pharmacy or pharmacist agrees to provide pharmacy services . . . ." *Id.* § 83-9-6(3)(b).
A "'[h]ealth benefit plan' means any entity or program that provides reimbursement for
pharmaceutical services." § 83-9-6(2)(c). [12]

Similarly, North Carolina's Any Willing Provider Law, N.C. Gen. Stat. § 58-51-37,
applies to "applies "to all health benefit plans providing pharmaceutical services benefits ... to
any resident of North Carolina." § 58-51-37(a). A "health benefit plan" is "any accident and
health insurance policy or certificate; nonprofit hospital or medical service corporation contract;
health, hospital, or medical service corporation plan contract; . . . plan provided by another
benefit arrangement . . . ." § 58-50-110(11). A health benefit plan "shall not . . . [d]eny a
pharmacy the opportunity to participate as a contract provider under a health benefit plan if the
pharmacy agrees to provide pharmacy services that meet the terms and requirements . . . of the
insurer under a health benefit plan . . . ." § 58-51-37(c)(2). [13]

Although neither the parties nor the Court found a case specifically addressing whether a
PBM was a "health benefit plan" subject to the three states' Any Willing Provider Laws, the
Court does find that the role of Express Scripts and its co-conspirators in "administering
pharmacy benefits for third parties" does not come within the reach of any of the three statutes at
issue. (Compl. ¶1.) *See* Thomas C. Fox, Health Care Financial Transactions Manual, § 11:37

---

[12]In *Mississippi State and School Employees' Life and Health Plan v. KCC, Inc.*, 108
So.3d 932 (Miss. 2013), the court held that § 83-9-6 applied to the Plan but declined to reach the
argument of the Plan's PBM because the lower court had not held to the contrary. *Id.* at 933,
940. Rather, the lower court had not addressed the issue at all. *Id.* at 940.

[13]In *Jacobs v. Physicians Weight Loss Ctr. of Am., Inc.*, 620 S.E.2d 232, 239 (N.C.
Ct.App. 2005), the court rejected the plaintiffs' argument that defendants' contract with
physicians to provide their patients medical services was a "health benefit plan" under North
Carolina's Any Willing Provider Law.

(2017) (noting that as of 2014, thirty states had "enacted some form of any willing provider law," twenty of which only applied to pharmacists and/or pharmacies, and that "[w]hile any willing provider laws can take many forms, they typically prohibit a managed care organization from discriminating against a provider willing to meet the network's criteria").

## Conclusion

In considering Irmat's eight-count complaint raising antitrust, contract, and Any Willing Provider claims, the Court has accepted as true all factual allegations; however, the Court finds that those allegations fail to state a claim. In so finding, the Court "[is] well aware of [the Eighth Circuit's reluctance to dismiss antitrust complaints before the parties have had an opportunity to fully conduct discovery." *Little Rock Cardiology*, 591 F.3d at 601. As the Eighth Circuit has also observed, however, "[g]iven the unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases, the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *Insuslate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir, 2015) (internal quotations, citations, and alterations omitted). (interim citation omitted).

Accordingly,

**IT IS HEREBY ORDERED** that the motion to dismiss of Express Scripts Holding Company and Express Scripts, Inc., is GRANTED. [ECF No. 18]

**IT IS FURTHER ORDERED** that the motion of motion of Express Scripts Holding

Company and Express Scripts, Inc., for oral argument is DENIED as moot. [ECF No. 21]

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

Dated this 21 day of February, 2018.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**